Case No. 23-3475

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

JACQUELYN MARES, M.D.,

Plaintiff-Appellant

v.

MIAMI VALLEY HOSPITAL, et al.,

Defendants-Appellees

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Case No. 3:20-cv-00453-MJN

---

## BRIEF OF APPELLANT JACQUELYN MARES, M.D.

---

Respectfully submitted,

MEZIBOV BUTLER
*/s/ Marc D. Mezibov*
 Marc D. Mezibov (OH No. 0019316)
615 Elsinore Place, Suite 105
Cincinnati, OH 45202
Phone: 513.621.8800
Fax: 513.621.8833
mmezibov@mezibov.com

MAREK WEISMAN, LLC

*/s/ Rachel Rutter* 332 S. Michigan Ave.,
Suite 900
Chicago, IL 60604 Phone: 312.470.7662

rrutter@marekweisman.com

*Attorneys for Plaintiff-Appellant Jacquelyn Mares, M.D.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, Plaintiff-Appellant certifies that no party to this appeal is a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation has a financial interest in the outcome of this matter.

# TABLE OF CONTENTS

Table of Authorities.................................................................................iv

Statement in Support of Oral Argument ...................................................1

Statement in Support of Jurisdiction........................................................2

Statement of the Issues Presented for Review ..........................................3

Statement of the Case...............................................................................4

Summary of the Argument........................................................................9

Argument.................................................................................................11

Conclusion ..............................................................................................27

Certificate of Compliance with F.R.A.P. 32............................................28

Certificate of Service ..............................................................................29

# TABLE OF AUTHORITIES

## Cases

*Al-Dabagh v. Case W. Res. Univ.*,
777 F.3d 355, 359-61 (6th Cir. 2015)) ...................................................19

*Allahverdi v. Regents of the Univ. of N.M.*,
2006 U.S. Dist. Lexis 27682, *22......................................................14

*Beal v. Minard*, 2023 U.S. App. LEXIS 14401, *9 (6th Cir. Jun. 8, 2023) ...........20

*Blue Fire Cap., LLC v. Pies & Pints Dev. Partners, LLC*,
2023 U.S. App. LEXIS 17963, *29-30 (6th Cir. Jul. 13, 2023) ...........................26

*Boinapally v. Univ. of Tenn.*, 23 Fed. Appx. 512
(6th Cir. Dec. 11, 2001) ...................................................................13

*Calhoun v. Morris*, 2023 U.S. App. LEXIS 19720, *3
(6th Cir. Jul. 31, 2023) ...................................................................12

*Cin. Dev. III LLC v. Cin. Terrace Plaza, LLC*,
2023 U.S. App. LEXIS 6132, *24-26 (6th Cir. Mar. 14, 2023) ...........................26

*Davis v. Mann*, 882 F.2d 967, 971-972 (5th Cir. 1989) .........................................14

*Ezekwo v. New York City Health & Hosps. Corp.*,
940 F.2d 775, 779 (2d Cir. 1991) ...........................................................14

*Fenje v. Feld*, 398 F.3d 620, 623 (7th Cir. 2005) ...................................................14

*Hodak v. Madison Capital Mgmt., LLC*,
348 Fed. Appx. 83, 90 (6th Cir. 2009) ...............................................23,24

*J. Endres v. Ne. Ohio Med. Univ.*,
938 F.3d 281, 298 (6th Cir. Aug. 30, 2019) .........................................19

*Jones v. Board of Governors of University of North Carolina*,
704 F.2d 713 (4th Cir. 1983) ...............................................11, 15, 16, 19

*Khoiny v. Dignity Health*, 76 Cal. App. 5th 390, 403
 (Cal. App. 2 Dist. Mar. 16, 2022) .............................................................13

*Mayo Found. For Med. Educ. & Research v. United States*,
562 U.S. 44 (2011) ....................................................................................13

*Mbawe v. Ferris State Univ.*,
751 Fed. Appx. 832, 842 (6th Cir. Nov. 6, 2018) ...................................19

*Patrick v. CitiMortgage, Inc.,* 676 F. App'x 573, 577 (6th Cir. 2017)) .............25,26

*Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) .................20

*Regents of University of Michigan v. Ewing,* 474 U.S. 214, 225-226 (1985) ........20

*Shaboon v. Duncan*, 252 F.3d 722, 727-728 (5th Cir. 2001) ..................................14

*Shah v. Univ. of Toledo*, 2022 U.S. App. LEXIS 16602,
*9-10 (6th Cir. Jun. 15, 2022) ................................................................19

*Schulkers v. Kammer* 955 F.3d 520, 539, 376 Ed. Law Rep. 95 (6th Cir. 2020) ....20

*Wood v. Strickland*, 420 U.S. 308, 326 (1975) .......................................................16

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

In accordance with Federal Rule of Appellate Procedure 34(a) and the 6th Circuit Rule 34(a), Plaintiff-Appellant Jacquelyn Mares, M.D. respectfully requests oral argument on the present appeal. This appeal raises important issues relating to the procedural and substantive due process rights afforded medical residents and fellows by the Fourteenth Amendment of the United States Constitution. Oral argument will aid the Court by allowing the parties to explore the issues presented in this appeal and respond to any inquiries raised.

## STATEMENT OF JURISDICTION

Plaintiff-Appellant Jacquelyn Mares, M.D. ("Dr. Mares") in this action asserted claims under federal law and the District Court had jurisdiction over those claims pursuant to 28 U.S.C. § 1331. She also asserted breach of contract claims under Ohio state law and the court had supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367 as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

This Court has jurisdiction over Dr. Mares' appeal because the District Court issued a final decision on May 2, 2023 granting summary judgment for Defendants on all claims and terminating the case ("SJ Order" RE 69). This appeal was filed by the August 21, 2023 due date set by this Court.

**STATEMENT OF ISSUES**

1. Did the District Court err as a matter of law in finding that there is no genuine issue of material fact that Defendants did not violate Dr. Mares' constitutional rights?

   a. Did the district court err as a matter of law in determining that Dr. Mares' rights to procedural due process were not violated?

   b. Did the district court err in finding that Dr. Mares was not deprived of her rights to substantive due process?

2. Did the District Court err in finding that there was no genuine issue of material fact with regard to Dr. Mares' breach of contract claim?

## STATEMENT OF THE CASE

### A. Procedural History and Rulings Presented for Review

Dr. Mares filed her original complaint in this action on November 5, 2020. (RE 1). She filed her amended complaint on March 15, 2022, asserting procedural Due Process (Count 1), substantive Due Process (Count 2), and equal protection claims (Count 5) under the United States Constitution, as well as two breach of contract claims under Ohio law (Counts 3 and 4). (RE 39 Page ID # 582-583).

Defendant-Appellees Wright State University ("WSU"), Miami Valley Hospital and its parent corporation Premier Health Partners (collectively "MVH"), and state officials Theodore Talbot, M.D. ("Dr. Talbot"), Jerome Yaklic, M.D. ("Dr. Yaklic"), and Albert Painter, Psy.D. ("Dean Painter") filed motions for summary judgment as to all claims. (RE 49, 57). Dr. Mares opposed the motions, except as to the breach of contract claims against WSU. (RE 66). Defendants replied. (RE 67, 68). The District Court granted the motions in full, dismissing all claims and terminating the case. (RE 69). Dr. Mares appeals all aspects of that ruling, save for equal protection claim, which Dr. Mares does not contest.

### B. Facts Relevant to the Issues Presented

Wright State University (WSU) is a publicly supported institution of higher education. Among its divisions is the Boonshoft School of Medicine (BSOM). BSOM sponsors a residency program in obstetrics and gynecology (OB/GYN) ("the

Program"). (Deposition of Theodore Talbot, MD., RE #54 PageID #1746-49). The Program is certified by the academic counsel for graduate medical education ("ACGME") which is the accreditation body of graduate residency/fellowship programs throughout the nation. (*Id.;* Deposition of Albert Painter, M.D., RE #53 PageID #1689-1691).

BSOM assigns physicians in the program to work at Dayton area hospitals including Miami Valley Hospital ("MVH") which is owned and operated by Premier Health ("Premier"), a private network of health programs and institutions. (Affidavit of Teresa Zryd, M.D., #RE 25-1 PageID 172-73; Deposition of Teresa Zryd, M.D. RE #61, PageID #2484-85) Premier serves as the employer of the residents in the program and provides the site for the clinical portion of the program. BSOM supplies and maintains the educational aspect of the Program. Zryd Dep. RE #61 PageID 2484-85; Talbot Dep. RE #54 PageID 1763-64).

Dr. Mares graduated from medical school in 2015. (Deposition of Jacquelyn Mares, M.D. RE #52, PageID #879). Upon her graduation, Mares completed an initial year in an OBGYN residency program at Hofstra University/NorthShore Hospital. (*Id.* at PageID 875). Dr. Mares then transferred to the Program where she started her second year of residency on June 13, 2016. (*Id.* PageID 892). She was scheduled to complete the four-year residency program at BSOM in June 2019. (Mares Dep. PageID 905). The Program enrolls twenty-four residents in total such

that there are routinely six residents employed during each of the Programs four academic years. (Deposition *Id.* PageID 910-911; Talbot Dep. RE #54 PageID 1759-60).

When residents are assigned to MVH, they enter into a Resident-Fellow Agreement with both MVH/Premier and BSOM. (Mares Dep. Exhibit D, RE 52-12 PageID 1281-1284). The Resident-Fellow Agreement sets forth the respective obligations of the resident and the employing institution. (*Id.*) Under the Resident-Fellow Agreement, Dr. Mares was required to meet various professional standards, most notably that "she performed satisfactorily to the best of his/her ability the customary services of an obstetrics/gynecology resident/fellow in each progressive year of the residency program." (*Id.*) The Resident-Fellow Agreement further provided that the contract may be terminated immediately by MVH at any time prior to its expiration - - if in the Programs' opinion the resident/fellow substantially fails to meet any of the general requirements of the program or is terminated by the Program. Academic progress and completion of the residency was at the sole discretion of the residents and program director and the relevant academic department clinical competency committee. (*Id.*). According to the Resident-Fellow Agreement, termination from the Program is governed by what is referred to as "Item 504 – Academic and Professional Standards/Due Process of the BSOM Resident

Manual". (*Id.* PageID 1283; Talbot Dep. Exhibit 23, RE 54-23, PageID 2077-2081; Exhibit 24 RE 54-24 PageID 2159).

The due process provisions of Item 504 allows a resident/fellow who is informed of his or her potential termination form the program to request a review of the proposed action by a three member physician hearing panel. RE 54-23, PageID 2077-2081. The role of the panel is to determine, following a hearing, "whether substantial evidence exists to support the program's intended action." (*Id.*). Following the evidentiary hearing, the panel must make a recommendation to the dean of BSOM and the chief academic officer of MVH/Premier who jointly decide to 1) affirm he program's intended action; 2) take revised action against the resident; or 3) not affirm the action. (*Id.*). The resident may appeal the decision to the provost of WSU. (*Id.*). The provost shall then decide to affirm or not affirm the decision to terminate the resident. (*Id.*).

In or about October 5, 2018, Dr. Mares was informed by Dr. Theodore Talbot, Program Director, that at a meeting on October 3, 2018, the Clinical Competency Committee ("CCC") of the OBGYN department had voted six to two in favor of dismissing her from the program. (Mares Dep. RE 52 PageID 1062-1064; Exhibit KK RE 52-31 PageID 1325). According to Dr. Talbot, the essential grounds for the proposed action was that "Despite formal probation March 8, 2018, mentoring, and repeated feedback sessions both written and verbal, you have continued to have

lapses in professionalism and communication with patients, faculty, and other residents/medical students. While you have demonstrated competency with medical knowledge and surgical skills, your progress with other required tasks pertaining to professionalism and communication have been unsatisfactory." (Mares Dep. Exhibit KK RE 52-31 PageID 1325; *See also* Mares Dep. Exhibit HHH, RE #52-25, PageID 1315-1317). Pursuant to Item 504, Dr. Mares timely filed an appeal of the proposed action to the physician panel. (Mares Dep. RE 52 PageID 1081; Mares Dep. Exhibit PP RE 52-44 PageID 1348-49).

At the hearing, the parties presented witnesses and documentary evidence to support their respective positions on the proposed action of dismissal. (Hearing Transcript, Talbot Dep. Ex. 26 RE 54-26 PageID 2224-2402). The Programs' witnesses were subjected to cross examination by the panelists and Dr. Mares was offered the opportunity to speak personally and/or to provide a statement from her faculty representative. (*Id.*) At the conclusion of the evidentiary portion of the hearing, the parties were afforded the opportunity to deliberate before they submitted their recommendation on the proposed action. (*Id.*)

Following the evidentiary hearing, the panel concluded unanimously that the Program had failed to provide substantial evidence to support its intended action to dismiss Dr. Mares. (Deposition of Christopher Croom, M.D., RE 65, PageID 2628; Talbot Dep. Exhibit 16, RE 54-16, PageID 1875-1876). Instead, the panel expressly

recommended that Dr. Mares not be terminated and that she be permitted to complete the final year of the Program and graduate subject to various terms and conditions that consistent with the recommendation of the panel. (*Id.*) Pursuant to the terms of Item 504 the panel's recommendation was submitted to Dr. Dunn, the dean of BSOM, and Dr. Zryd, the administrative vice president of MVH/Premier. (*Id.*). According to one of the panel members, the panel's conclusion was to be outcome determinative regarding Dr. Mares's termination. (Croom Dep. RE 65, PageID 2627).

 Dr.'s Dunn and Zryd refused to accept the recommendation of the panel and accepted the recommendation of the Program that Dr. Mares be dismissed. (Talbot Dep. Exhibit 17, RE 54-17, PageID 1877). In turn, Dr. Mares filed a further appeal to Susan Edwards, provost of WSU who rejected the appeal and proceeded to direct that Dr. Mares be dismissed from the Program. (Mares Dep. Exhibit AAAA RE 52-4, PageID 1233-1238; Talbot Dep. Exhibit 18 RE 54-18, PageID 1878). This lawsuit ensued. (RE 1).

## SUMMARY OF THE ARGUMENT

The District Court erred in failing to properly evaluate both Dr. Mares' constitutional claims and her state law claim for breach of contract.

First, the District Court's decision that Dr. Mares received the appropriate amount of process was predicated on the faulty premise that Dr. Mares was entitled

only to the amount of process owed to a student dismissed from an educational institution for academic reasons in contrast to the greater level of process owed an employee dismissed from a residency program for professional reasons. Considered in terms of the nature, purpose, and consequences of enrollment in a professional residency program, Dr. Mares's claim should be evaluated from the perspective that she was entitled to the constitutional protections owed professional employees who enjoy a property interest in their continued enrollment and employment as physicians in a professional graduate program.

Second, even if the District Court was correct that Dr. Mares's relationship was closer to that of a student than that of an employee, the District Court's decision to dismiss her constitutional claims was nonetheless erroneous. As this Court has expressly noted, "whether the university describes conduct as academic or disciplinary does not dictate what process the Constitution demands. As a default, it is the Constitution, not a university handbook, that establishes what process is due: the Constitution sets the floor or lowest level of procedures available." *J. Endres v. Northeast Ohio Medical University,* 938 F.3d 281, 300 (6th Cir. 2019) (quoting *Flain v. Medical College of Ohio,* 418 F.3d 629, 636 (6th Cir. 2005)). That floor has been firmly established. According to the Supreme Court, and a litany of decisions from this Court, whatever process is adequate for even academic dismissals to meet due process requirements, the University's evaluation and ultimate decision must be

"careful and deliberate." *Id.* (quoting *Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 85 (1978)).

The process by which Dr. Mares was terminated does not reach even this lowest of constitutional standards. The initial decision to dismiss was based upon speculation, hearsay, bias, and without any notice to or input from Dr. Mares. Moreover, when, pursuant to the contract, Dr. Mares appealed the proposed action under Item 504, the hearing which she was afforded proved to be of no moment. The unanimous recommendation of the hearing panel that the program lacked substantial evidence to support its proposed action was rejected out of hand without substantive explanation. In short, "the illusion was due process, but the substance was arbitrary action." *Jones v. Board of Governors of University of North Carolina,* 557 F.Supp. 263, 269. (W.D.N.C. 1983).

In sum, whether Dr. Mares is properly characterized as a student, or as an employee, the ultimate decision to dismiss her was anything but careful and deliberate in nature. To the contrary, the evidence on the record reflects that the decision to dismiss Dr. Mares was arbitrarily predetermined and summarily executed without regard for the spirit or the terms of either constitutional due process or the MVH's contractual obligations under Item 504.

**ARGUMENT**

**A. Standard of Review**

This Court reviews the district court's grant of summary judgment *de novo*, and it is appropriate if the movant demonstrates that no genuine of material fact exists and the movant is entitled to judgment as a matter of law. The record must be reviewed in the light most favorable to the nonmovant, and credibility judgments and weighing of the evidence are prohibited. A dispute of material fact is genuine if sufficient evidence exists, when considered in the light most favorable to the nonmovant, for a reasonable jury to find for the nonmovant. *Calhoun v. Morris*, 2023 U.S. App. LEXIS 19720, *3 (6th Cir. Jul. 31, 2023).

### B. Procedural Due Process Claim Against WSU[1]

The process by which Dr. Mares was terminated was flawed from its inception. The initial determination to dismiss her from the program was the result of a decision made by a 6-2 vote of the Clinical Competency Committee which was submitted to Dr. Talbot for approval and execution. According to the testimony of Dr. David McKenna, a member of the CCC, the process by which the decision was reached was "based on hearsay, biased and flawed," and a "grave mistake." (RE 52-20 PageID 1308-1309; RE 63, PageID #2572). Dr. Mares appealed her termination under Item 504 and prevailed in her due process hearing held on November 7, 2018. The panel of three impartial physician faculty members found her termination was

---

[1] The District Court did not separately analyze the federal claims against MVH, but simply granted summary judgment on the same basis it did for WSU. (SJ Order RE 69 Page ID # 2837). Dr. Mares seeks reversal of that decision on the bases herein.

not supported by substantial evidence and recommended that she be permitted to continue her training under a remediation plan.[2] (Panel report RE 54-16). However, the findings of the hearing panel were rejected without any substantive analysis or response by Drs. Zryd and Dunn. Dr. Mares's secondary right of appeal was rejected in an even more cursory manner by WSU Provost Susan Edwards. (RE 54-18).

### 1. Dr. Mares should be Treated As an Employee for the Purpose of Due Process.

The District Court ruled it "must analyze Dr. Mares's procedural due process claim under the framework governing students' claims" because she "was closer to a student than an employee." (SJ Order RE 69 Page ID # 2828-2829). The better approach is to consider residents employees. (Mares SJ Br., RE 66 Page ID # 2767, 2769-2771). *See, e.g., Khoiny v. Dignity Health*, 76 Cal. App. 5th 390, 403 (Cal. App. 2 Dist. Mar. 16, 2022) ("treating [a] residency program as 'primarily' an academic program does not match the realities of medical residency programs. They are employment programs with an educational component.") This aligns more

---

[2] While not directly dispositive of the claims at issue, it is worthy of note that the hearing disclosed evidence that the program's decision to terminate Dr. Mares was motivated by its concern that she had not made yet decided to pursue Board Certification, a consideration which was acknowledged by officials to be a matter of serious concern. The Program's accreditation was, in part, dependent on maintaining a "take rate" of at least 80% of its graduates sitting for board certification. If, as they postulated, Dr. Mares declined to the sit for Board Certification after graduation, the program would be negatively affected. (Hearing Transcript, RE 52-64, PageID 1530-31).

closely with court rulings in other contexts. *See, e.g., Mayo Found. For Med. Educ. & Research v. United States*, 562 U.S. 44 (2011) (residents are employees and not students for purposes of FICA taxes); *Boinapally v. Univ. of Tenn.*, 23 Fed. Appx. 512 (6th Cir. Dec. 11, 2001) (Title VII employment discrimination claim asserted by medical resident).

### 2. Whether Treated as a Student, or Employee, The Process Provided to Dr. Mares was Not Careful And Deliberate.

In any event, the distinction between students and employees is irrelevant here for one simple reason: even the liberal standard applied to academic decisions was not met because WSU terminated Dr. Mares despite the Due Process Panel's finding of fact there was insufficient evidence for termination. This distinguishes cases cited by the District Court, all of which involved either an unsuccessful internal appeal or none at all. (SJ Order RE 69 Page ID # 2829). *See Fenje v. Feld*, 398 F.3d 620, 623 (7th Cir. 2005) ( "a three-member committee comprised of physicians in the [University of Illinois Chicago] anesthesiology department… voted unanimously to uphold the termination" of resident); *Shaboon v. Duncan*, 252 F.3d 722, 727-728 (5th Cir. 2001) (no internal appeal); *Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 779 (2d Cir. 1991) (no internal appeal); *Davis v. Mann*, 882 F.2d 967, 971-972 (5th Cir. 1989) ("five members of the dental and medical professions…recommended to Mann that [resident] be dismissed from the [General Practice Residency] program); *Allahverdi v. Regents of the Univ. of N.M.*, 2006 U.S.

Dist. Lexis 27682, *22 ("The Second GME Committee unanimously upheld the decision to dismiss" resident).

*Allahverdi* is instructive. There, a panel was convened twice during the medical resident's tenure. The first time, the panel "concluded [the program] had 'just cause' to terminate him," but recommended "that he should be reinstated subject to seven conditions" of remediation. 2006 U.S. Dist. Lexis 27682, at *6. As a result, the resident was not dismissed, even though the panel had found a basis to do so. The resident again fell short later, and on the second occasion the panel "unanimously upheld the decision to dismiss" him without suggested remediation. *Id*., at *22. Accordingly, the medical school Dean upheld dismissal and rejected the resident's appeal. *Id*., at *24. The institution followed the panel's decision on both occasions, using its latitude on the first occasion to impose a <u>lesser</u> consequence, not greater, than justified by the panel's factual finding.

Directly on point is *Jones v. Board of Governors of University of North Carolina*, 704 F.2d 713 (4th Cir. 1983). There, a student committee found the plaintiff nursing student guilty of cheating on an exam, but she appealed and a hearing panel of three faculty members conducted a full evidentiary hearing and found she was not guilty. *Id*., at 714-715. The university Chancellor then ignored that result and dismissed the student anyway after "review[ing] the transcript of the proceedings before the Hearing Panel, as well as memoranda submitted by counsel,

and reach[ing] a contrary determination….” *Id*., at 715. The student filed suit for violation of procedural Due Process, and sought a preliminary injunction which was granted by the lower court. *Id*., at 715; *Jones v. Board of Governors of University of North Carolina*, 557 F. Supp. 263 (W.D.N.C. 1983).

On appeal by the university, the Fourth Circuit affirmed. It opened by noting that “in the unique context of academic disciplinary procedures, we emphasize at the outset our understanding that federal courts must accord great deference to the administration of those procedure by state educational institutions.” 704 F.2d at 715, *citing Wood v. Strickland*, 420 U.S. 308, 326 (1975). Nonetheless, it found the nursing student “raise[d] serious questions of both fact and law under controlling procedural due process doctrine” as to whether she was deprived of “rudimentary precautions against unfair or mistaken findings.” 704 F.2d at 716. The Fourth Circuit focused on the fact that the higher official’s determination conflicted with the outcome of an earlier internal evidentiary hearing (*Id*., at 716):

> The procedures commenced with a student tribunal’s adverse determination…this was followed by…another tribunal whose exact role—whether as de novo fact finder, merely advisory fact-finder, or appellate reviewer—was at best unclear throughout to all concerned. This latter tribunal’s determination favorable to Jones—reached after a full evidentiary hearing and formally expressed as a factual finding of “not guilty” of the academic offense charged—was then either “reversed” as a finding or “disregarded” as advice by the ultimate decision-maker, a University officer acting by delegation of the chief administrative officer. This ultimate decision was concededly made solely upon review of the written record of the hearing tribunal’s evidentiary

hearing and without any expression of reasons for the reviewing
officer's rejection of the tribunal's determination, whether that
determination was rendered as finding or as advice.

Here, Dr. Mares' situation is the same on all points. The Panel's proceeding

and finding of fact was simply ignored, as if it never occurred. The notification letter

added vague allegations that had not even been raised, much less supported by the

evidence before the Panel, for example that Dr. Mares was "insubordinate" (*id*.), an

apparent reference to her refusal to sign the dismissal letter (RE 54-14 Page ID #

1872), and that she had been cited for falsifying a "patient safety report", which was

proven to be false. (Edwards Deposition RE 51 PageID 814). Drs. Dunn and Zyrd

rejected the Panel's "recommendation"—*i.e.* the specifics of the remediation plan

(RE 54-16 Page ID # 1876)—but their letter did not explain by what authority they

rejected the panel's finding of fact that there was "not substantial evidence to

support" termination. (RE 54-16 Page ID # 1875-1876).

Dr. Dunn admitted she did not know much about Dr. Mares' dismissal or the

Panel hearing, and did not talk to the Program Director about Dr. Mares; did not talk

to any Panel members about their findings or recommendation; did not feel it

necessary to defer to them; did not know what the Panel considered; did not know

what Dr. Mares presented; had only a vague understanding of burnout and did not

know it was an issue with Dr. Mares; did not remember any issues about Dr. Mares

taking the Boards; does not recall whether she reviewed any faculty letters of support

for Dr. Mares. (Dunn Dep. RE 50 Page ID # 749-773). In fact, she did not even read the transcript of the Panel hearing. (*Id*. Page ID # 750).

Dr. Zryd, for her part, admitted she knew even less than Dr. Dunn that about Dr. Mares' dismissal and the Panel hearing. She simply received notice from WSU that Dr. Mares had been dismissed, and "signed off" on the termination letter. (Zryd Dep. RE 61 Page ID # 2488). She believed it was "not her place" to make any decisions about termination; WSU alone made the decision to terminate Dr. Mares and reject her appeal; she did not agree or disagree with the decision; did not believe Item 504 had any bearing on her action; she "made the assumption" that Dr. Mares received adequate due process; did not know how the Panel members were selected; did not know the specific purpose of the Panel hearing; thinks the Panel may have been "sympathetic" to Dr. Mares; did not feel she had any obligation to determine why the Panel disagreed with termination; did not know whether any of the Panel's remediation recommendations had been attempted previously; did not know burnout was an issue in Dr. Mares' termination; did not know taking the Boards was an issue; and did not know why Dr. Dunn wrote what she did in the appeal rejection letter. (*Id*., Page ID # 2489-2517).

Dr. Mares invoked her right to a secondary appeal, but it was rejected in a similarly dismissive and insubstantial manner by WSU Provost Susan Edwards. (RE 54-18). Dr. Edwards cited no authority allowing WSU and MVH to set aside the

Panel's findings of fact and impose a consequence—termination—not supported by that finding. (*Id*.)

In contrast the Fourth Circuit's decision in *Jones* reflects deference to highly experienced and informed faculty review committees in the face of truncated and derivative later decisions by officials. Similarly, in *Al-Dabagh*, *supra*, the Sixth Circuit deferred to the decision of the school's Committee on Students, which was "assembled from the university's faculty and administrators" and served as the primary reviewer of the resident's conduct. 777 F.3d at 357. The medical resident in that case was challenging the institution's decision not to allow him to graduate. *Id*. WSU owed Dr. Mares, at very least, the due process of a "careful and deliberate" decision. *Shah v. Univ. of Toledo*, 2022 U.S. App. LEXIS 16602, *9-10 (6th Cir. Jun. 15, 2022); *J. Endres v. Ne. Ohio Med. Univ.,* 938 F.3d 281, 298 (6th Cir. Aug. 30, 2019); *Mbawe v. Ferris State Univ*., 751 Fed. Appx. 832, 842 (6th Cir. Nov. 6, 2018). The most careful and deliberate decision on her fate was reached by the Due Process Panel, which engaged with her and her accusers directly on all issues, and it was not careful and deliberate for implementing officials to reject the Panel's finding that there was not substantial evidence supporting termination.

### C. The Decision to Dismiss Dr. Mares was Arbitrary and Capricious, In Violation of Dr. Mares's Right to Substantive Due Process.

WSU was not entitled to summary judgment on Dr. Mares' substantive Due Process claim as a matter of law. Contrary to its opinion, Dr. Mares did not argue to

the District Court that her substantive Due Process rights were violated because her procedural Due Process rights were violated. (SJ Order RE 69 Page ID 2834). She argued that her substantive Due Process rights were violated because WSU arbitrarily and capriciously deprived her of her liberty and property interests in her professional pursuits and choice of livelihood.

Although somewhat unclear in the District Court's recitation of the legal standard (SJ Order RE 69 Page ID # 2834), this is a completely separate prong of substantive Due Process and no "conscience shocking" conduct is required. *Beal v. Minard*, 2023 U.S. App. LEXIS 14401, *9 (6th Cir. Jun. 8, 2023) (a "constitutionally protected interest has been deprived through arbitrary and capricious government action, <u>or</u> that the defendants' conduct shocks the conscience"). "The touchstone of due process is the protection against arbitrary governmental action, including 'the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Schulkers v. Kammer* 955 F.3d 520, 539, 376 Ed. Law Rep. 95 (6th Cir. 2020) (*See also Regents of University of Michigan v. Ewing,* 474 U.S. 214, 225-226 (1985)).

Under the federal standard, a state action is "'arbitrary and capricious where it is 'not supportable on any rational basis' or is 'willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case.'" *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) (quoting

*Greenhill v. Bailey,* 519 F.2d 5, 10 n. 12 (8th Cir. 1975)(internal cites omitted). The latter standard, "without consideration, and in disregard of the facts or circumstances of the case," has particular resonance in this case.

Here, at every stage of the procedure to dismiss Dr. Mares, the program displayed an arbitrary and capricious disregard for the facts; from the time of the initial determination by the CCC and Program Director to terminate Dr. Mares, the determination was made on the basis of bias, hearsay, and flawed decision making. (McKenna Dep. RE 63 PageID 2572). The Due Process Panel disagreed and found, after a careful and deliberate evidentiary hearing, that there was not substantial evidence supporting the CCC determination and that Dr. Mares should undergo remediation and counseling and instead of termination. The subsequent decision makers testified that they gave no deference, no consideration, and no value to the Hearing Panel's process and determination. Dr. Dunn testified that she assigned no deference to the Panel recommendation, she did not review the Panel Hearing. Despite the fact that she ostensibly rejected the Panel's decision and terminated Dr. Mares on the basis of "critical communication deficiencies" and for entering incorrect information in a "patient safety report," she did not even know what a patient safety report was. (Dunn Dep. RE 50 Page ID # 749-773).

For her part, Dr. Zryd felt no obligation to even consider whether there was a factual basis for terminating Dr. Mares:

Q Didn't you feel you had an obligation to

ascertain whether they felt there was or was not substantial

evidence to support the program's intended action?

MR. PIERSALL: Same objection. You can answer.

THE WITNESS: No.

(Zryd Dep. RE 61, PageID 2503).

Finally, Provost Edwards testified that her decision to deny Dr. Mares' secondary appeal came down to simply a question of numbers: the CCC had six members who voted to dismiss Dr. Mares, while the Hearing Panel had "not just three individuals." [referring to the panel] (RE 51, PageID 806-807). This decision was made in complete disregard of role and purpose of the Hearing Committee to investigate the basis for the CCC decision and the fact that one of the CCC members, Dr. McKenna, had personally written Dr. Edwards to tell her in no uncertain terms that the CCC decision was "arbitrary and capricious." (RE 52-20 PageID 1308-1309; McKenna Dep. RE 63, PageID 2578).

At every stage of the process, Dr. Mares's attempts to receive a procedurally fair consideration were stymied by the obstinate refusal of the decisionmakers to engage with the facts and circumstances of her dismissal in any substantial way. The arbitrary and capricious "rubber stamping" of Dr. Mares's termination is precisely the kind of "willful and unreasoning action, without consideration and in disregard

of the facts or circumstances of the case" that the right to substantive due process is intended to guard against. *Schulkers*, 55 F.3d at 539

### D. Contract Claim Against MVH

Genuine disputes of material fact preclude summary judgment on Dr. Mares' claim against MVH for its manifest breach of the employment contract with Dr. Mares, including, and with respect to, violation of the doctrine of good faith and fair dealing.

### 1. Genuine Disputes Regarding Explicit Terms

While the District Court notes that contract interpretation is generally a question of law and not fact, the issue here is not of a contract's interpretation, but its performance. *Id.*, at 2838 In this case there are many disputed issues as to whether Defendants complied with their obligations. The issue of breach is an issue of fact. *Hodak v. Madison Capital Mgmt., LLC,* 348 Fed. Appx. 83, 90 (6th Cir. 2009) (vacating summary judgment below; "the determination of whether a material breach has occurred is generally a question of fact.") Here, Dr. Mares presented more than enough evidence to warrant a jury determination of whether MVH (and WSU as its surrogate, see below) complied with their obligations under the employment agreement, or whether they failed Dr. Mares and breached those obligations.

The District Court assumes its ruling on Dr. Mares' constitutional due process claim against WSU is sufficient to resolve her contractual due process claim against

MVH. (SJ Order, RE 69, PAGE ID # # 2833, "Likewise, the Court has already found that, beyond any genuine disputes of material fact, all Defendants followed the due process procedure in Item 504.") But the court's due process analysis did not examine and find that MVH complied with its contractual obligations; it examined and found that WSU, as a state entity, complied with its minimal constitutional due process obligations by providing Dr. Mares with notice and an opportunity to be heard. (*Id.*, Page ID # 2833.) It was error for the district court to apply the constitutional standard for students, not MVH's standard under the employment agreement.

The contract says Dr. Mares may be terminated if she "is terminated by the Program consistent with the Wright State University Boonshoft School of Medicine, Resident Manual, Item 504 – Academic and Professional Standards/Due Process." (*Id.*) That is the very issue under consideration—whether MVH and Premier breached their due process obligations—and it is a disputed issue of material fact precluding summary judgment. In other words, while the court's truncated quote from the employment contract may have raised only an issue of law, the full quote raised an issue of fact for a jury. *Hodak,* 348 Fed. Appx. at 90.

MVH's violation of the employment agreement is unmistakable. Under Item 504, Dr. Mares was entitled to an evidentiary hearing before an impartial, three-physician panel, to make a recommendation and determine whether there was

substantial evidence to support the program's proposed action. The panel unanimously decided the program failed to meet that burden, and consistent with the terms of the contract, provided an alternative recommendation. That recommendation was, for all intents and purposes, ignored as if it never happened. Neither Dr. Dunn, nor Dr. Zryd, nor Dr. Edwards, directly addressed the recommendation, nor explained in any substantial way why they rejected that recommendation. The careful and deliberate evidentiary hearing performed in compliance with the program's own rules and regulations, the contractual terms, and the ACGME standards was rendered procedurally irrelevant. By way of analogy, what happened here is tantamount to a judge issuing a sentence on the heels of a jury's verdict that the accused was not guilty of the crime with which she was charged.

### 2. Genuine Disputes Regarding Implied Good Faith

The District Court stated that "Given that no breach of the agreement occurred, the Court will not entertain Dr. Mares's 'free-standing' good faith claim," (SJ Order RE 69 Page ID # 2839, *citing Patrick v. CitiMortgage, Inc.,* 676 F. App'x 573, 577 (6th Cir. 2017)). The implied covenant of good faith and fair dealing doctrine exists for the sole purpose offering justice where a defendant has not breached the letter of a contract but has breached its spirit of good faith and fair dealing by exercising discretion in a bad faith way not reasonably expected by the

other party. *Cin. Dev. III LLC v. Cin. Terrace Plaza, LLC,* 2023 U.S. App. LEXIS 6132, *24-26 (6th Cir. Mar. 14, 2023).

*Patrick* does not require there to be a breach of a written term in addition to a breach of good faith, nor would there be any purpose to the doctrine if it stands or falls with breach of a written term. As reflected by the Sixth Circuit's recent decision in *Blue Fire Cap., LLC v. Pies & Pints Dev. Partners, LLC,* 2023 U.S. App. LEXIS 17963, *29-30 (6th Cir. Jul. 13, 2023), what *Patrick* requires is that a plaintiff allege "a specific implied contractual obligation" and not just make a general allegation of bad faith. The Ohio state court cited by *Patrick*, 676 F. App'x at 577, namely *Mortgage Elec. Registration Sys. v. Mosely*, 2010-Ohio-2886 (Ohio Ct. App. 8 Dist. Jun. 24, 2010), makes that point. *Id*., at P46-48. While the Sixth Circuit requires a plaintiff to identify specific contract term in connection with a good faith claim, it means a term that allowed discretion in a way that was abused; it does not mean, as interpreted by the District Court here, a contract term that was breached <u>in addition</u> to breach of the duty. *Cin. Dev. III LLC,* 2023 U.S. App. LEXIS 6132 at *24-26.

Here, Dr. Mares supported her breach of contract claims with evidence. is that MVH breached the employment agreement's explicit terms in ways described above. There are genuine disputes of material fact as to whether MVH breached their obligations to Dr. Mares either expressly, or by virtue of violation of the covenant of

good faith and fair dealing. In either case, the District Court should not have granted summary judgment in their favor.

## XI. CONCLUSION

For the foregoing reasons, the District Court's grant of summary judgment should be reversed as to Counts 1, 2, 3 and 4.

Respectfully submitted,

MEZIBOV BUTLER

*/s/ Marc D. Mezibov*
Marc D. Mezibov (OH No. 0019316)
615 Elsinore Place, Suite 105
Cincinnati, OH 45202
Phone: 513.621.8800
Fax: 513.621.8833
mmezibov@mezibov.com

and

MAREK WEISMAN, LLC

*/s/ Rachel Rutter*
332 S. Michigan Ave.,
Suite 900
Chicago, IL 60604
Phone: 312.470.7662
rrutter@marekweisman.com

*Attorneys for Plaintiff-Appellant Jacquelyn Mares, M.D.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify the following:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,030 words, excluding the parts of the brief exempted by the Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: August 21, 2023                    */s/ Marc D. Mezibov*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit on August 21, 2023, by using the appellate CM/ECF system. I certify that service will be accomplished on that date by the appellate CM/ECF system on all counsel of record for Appellees.


*/s/ Marc Mezibov*