No. 23-3475

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JACQUELYN MARES, | : | On Appeal from the |
|     Plaintiff-Appellant, | : | United States District Court |
| v. | : | Southern District of Ohio |
| | : | |
| MIAMI VALLEY HOSPITAL, ET AL., | : | District Court Case No. |
|     Defendants-Appellees. | : | 3:20-cv-00453 |
| | : | |
| | : | |
| | : | |

## BRIEF OF APPELLEES WRIGHT STATE UNIVERSITY, ET AL.

DAVE YOST
Ohio Attorney General

BENJAMIN M. FLOWERS*
Solicitor General
  *Counsel of Record
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
Benjamin.Flowers@OhioAGO.gov

*Counsel for Appellees*
  *Wright State University, Albert F. Painter,*
*Theodore Talbot, and Jerome L. Yaklic*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................ii

STATEMENT REGARDING ORAL ARGUMENT ...........................vi

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF THE ISSUES .......................................................2

INTRODUCTION ............................................................................3

STATEMENT OF THE CASE ..........................................................5

SUMMARY OF ARGUMENT...........................................................28

STANDARD OF REVIEW ................................................................32

ARGUMENT....................................................................................32

    I.     The Wright State defendants did not violate Dr. Mares's due-process rights...............................................................................34

        A.    Dr. Mares's procedural-due-process claim fails. ................................34

            1.    Students are entitled to only minimal process if dismissed from an educational program due to underperformance. .....................34

            2.    Dr. Mares received sufficient process. ..........................................39

            3.    Dr. Mares's contrary arguments are unpersuasive. .......................45

        B.    Dr. Mares's substantive-due-process claim fails. ..............................55

    II.    Qualified immunity bars Dr. Mares's claims for money damages against Drs. Painter, Talbot, and Yaklic. ................................................58

CERTIFICATE OF COMPLIANCE....................................................62

CERTIFICATE OF SERVICE ..........................................................63

DESIGNATION OF DISTRICT COURT RECORD..........................64

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Al-Dabagh v. Case Western Reserve Univ.*,
  777 F.3d 355 (6th Cir. 2015) ....................................................................4, 38, 57

*Bd. of Curators of Univ. of Mo. v. Horowitz*,
  435 U.S. 78 (1978) ............................................................................................*passim*

*Bell v. Ohio State Univ.*,
  351 F.3d 240 (6th Cir. 2003) ...........................................................31, 56, 57, 58

*Calderone v. City of Chicago*,
  979 F.3d 1156 (7th Cir. 2020) .............................................................................38

*Chambers v. Sanders*,
  63 F.4th 1092 (6th Cir. 2023) ..............................................................................56

*In re City of Detroit*,
  841 F.3d 684 (6th Cir. 2016) ...............................................................................55

*City of Tahlequah v. Bond*,
  142 S. Ct. 9 (2021) ........................................................................................ 32, 59

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985)................................................................................................35

*County of Sacramento v. Lewis*,
  523 U.S. 833 (1998)................................................................................................56

*District of Columbia v. Wesby*,
  583 U.S. 48 (2018) ................................................................................................59

*Doe v. Cummins*,
  662 F. App'x 437 (6th Cir. 2016) .................................................................38, 51

*Doe v. Miami Univ.*,
  882 F.3d 579 (6th Cir. 2018) .........................................................................31, 56

*Elder v. McCarthy*,
  967 F.3d 113 (2d Cir. 2020) ................................................................................51

*Elmark v. Matthews*,
    524 F. App'x 62 (5th Cir. 2013) ........................................................ 36

*Endres v. Ne. Ohio Med. Univ.*,
    938 F.3d 281 (6th Cir. 2019)...............................................*passim*

*Ezekwo v. New York City Health & Hosps. Corp.*,
    940 F.2d 775 (2d Cir. 1991) ............................................................40

*Fenje v. Feld*,
    398 F.3d 620 (7th Cir. 2005) .............................................. 40, 41, 46

*Flaim v. Med. College of Ohio*,
    418 F.3d 629 (6th Cir. 2005) ...........................................................39

*Gilbert v. Homar*,
    520 U.S. 924 (1997) .................................................................. 35, 36

*Golf Vill. North, LLC v. City of Powell*,
    42 F.4th 593 (6th Cir. 2022) .................................................... 29, 34

*Goss v. Lopez*,
    419 U.S. 565 (1975) .................................................................. 36, 44

*Head v. Chicago Sch. Reform Bd. of Trustees*,
    225 F.3d 794 (7th Cir. 2000) ...........................................................51

*Heyerman v. County of Calhoun*,
    680 F.3d 642 (6th Cir. 2012) ...........................................................60

*Jackson v. City of Cleveland*,
    925 F.3d 793 (6th Cir. 2019)............................................................32

*Jones v. Bd. of Governors of Univ. of North Carolina*,
    704 F.2d 713 (4th Cir. 1983) ...........................................................50

*Jones v. Hamilton Cnty. Sheriff*,
    838 F.3d 782 (6th Cir. 2016) ...........................................................33

*Kaplan v. Univ. of Louisville*,
    10 F.4th 569 (6th Cir. 2021).................................................29, 35, 39

*Ku v. Tennessee*,
    322 F.3d 431 (6th Cir. 2003) ............................................................38

*Kuhn v. Washtenaw County*,
    709 F.3d 612 (6th Cir. 2013) ........................................................... 51

*Laborers' Int'l Union, Local 860 v. Neff*,
    29 F.4th 325 (6th Cir. 2022) .................................................... 28, 33

*Loudermill v. Cleveland Bd. of Ed.*,
    844 F.2d 304 (6th Cir. 1988) ............................................................36

*McCormick v. Miami Univ.*,
    693 F.3d 654 (6th Cir. 2012) .................................................... 28, 33

*Morrissey v. Brewer*,
    408 U.S. 471 (1972) ..........................................................................35

*Pearson v. City of Grand Blanc*,
    961 F.2d 1211 (6th Cir. 1992) .................................................5, 57, 58

*PennEast Pipeline Co. v. New Jersey*,
    141 S. Ct. 2244 (2021) ......................................................................33

*Poppy v. City of Willoughby Hills*,
    96 F. App'x 292 (6th Cir. 2004) .......................................................60

*Range v. Douglas*,
    763 F.3d 573 (6th Cir. 2014) ................................................ 31, 56, 57

*Regents of University of Michigan v. Ewing*,
    474 U.S. 214 (1985) ................................................................37, 39, 60

*Reno v. Flores*,
    507 U.S. 292 (1993)............................................................... 29, 31, 55

*Schwamberger v. Marion Cty. Bd. of Elections*,
    988 F.3d 851 (6th Cir. 2021) ............................................................46

*Shaboon v. Duncan*,
    252 F.3d 722 (5th Cir. 2001) ................................................ 30, 40, 46

*United States v. Hairston*,
    502 F.3d 378 (6th Cir. 2007) ............................................................49

*Walters v. Nat'l Ass'n of Radiation Survivors*,
    473 U.S. 305 (1985) ................................................................... 39, 47

**Statutes and Constitutional Provisions**

U.S. Const. amend XIV .......................................................4, 29, 34, 55

28 U.S.C. §1291 ...............................................................................1

28 U.S.C. §1331 ...............................................................................1

Ohio Rev. Code §3345.011 ........................................................... 28, 33

**Other Authorities**

*College Dropout Rates*, Education Data Initiative (June 17, 2022) ...........................39

## STATEMENT REGARDING ORAL ARGUMENT

While the plaintiff's legal claims lack merit, this case comes with an extensive record. To ensure that there is no confusion about how the law applies to the undisputed facts, the Wright State defendants—consisting of Wright State University, Albert F. Painter, Psy.D., Theodore Talbot, M.D., and Jerome L. Yaklic, M.D.—request oral argument.

## JURISDICTIONAL STATEMENT

The plaintiff, Jacquelyn Mares, M.D., claims that the Wright State defendants violated her constitutional rights.  Am. Compl., R.39, PageID#582–83.  The District Court had subject-matter jurisdiction over those claims under 28 U.S.C. §1331.  But, as discussed below, principles of sovereign immunity bar Dr. Mares's claims against Wright State University.  Last May, the District Court granted all of the defendants summary judgment as to all of Dr. Mares's claims.  Order, R.69, PageID#2839.

Dr. Mares timely appealed.  This Court has statutory jurisdiction to hear her appeal under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

Dr. Mares was a medical resident at Wright State University. During her residency, she repeatedly engaged in unprofessional behavior. After trying lesser forms of discipline, Wright State dismissed Dr. Mares from its residency program. Pursuant to Wright State's internal policies, Dr. Mares could appeal her dismissal. Dr. Mares did so, and she received a full hearing. And she ultimately appealed her dismissal to the provost of Wright State University, the final decisionmaker in the process. When that failed, Dr. Mares sued Wright State, three of its faculty members, and a few private parties as well. This appeal presents the following questions with respect to the Wright State defendants:

1.  Does sovereign immunity bar all claims against Wright State University?

2.  Did the individual Wright State defendants comply with the Fourteenth Amendment's Due Process Clause when they dismissed Dr. Mares for unprofessional behavior?

3.  Does qualified immunity bar damage claims against the Wright State employees that Dr. Mares sued in their personal capacities?

# INTRODUCTION

Dr. Jacquelyn Mares hoped to specialize in obstetrics and gynecology. After spending a year at another school's medical residency program for that specialty, she transferred into the residency program at Wright State University. Once there, she regularly behaved unprofessionally, often by her own admission. She was "completely atrocious to medical students." Hearing Tr., R.54-26, PageID#2324. She lost her temper with fellow doctors, even walking out of the delivery room on one occasion. Mares Depo., R.52, PageID#967, 969. She "exploded" at hospital staff, too. *Id.*, PageID#1031.

Wright State's faculty members grew dissatisfied with Dr. Mares's recurring lapses in professionalism. They tried various forms of discipline: a warning letter, a five-day suspension, and probation. After those steps failed, Wright State dismissed Dr. Mares from its residency program. Wright State treated that decision with the seriousness it deserved. Its decisionmaking process involved multiple stages of review, including a hearing and a written appeal. In total, fifteen doctors from the Wright State community weighed in on Dr. Mares's fate. All agreed that Dr. Mares behaved unprofessionally and deserved discipline. A handful thought Dr. Mares should receive yet one more chance to correct her behavior. But most concluded that Dr. Mares already received enough chances, and that Wright State

would risk its reputation by allowing her to graduate. This majority included the director of Dr. Mares's residency program, the dean of the medical school, and the provost of Wright State, who made the final decision.

This case presents the following question: Did Wright State's procedure, or its ultimate dismissal decision, deprive Dr. Mares of her right to "due process of law"? U.S. Const. amend XIV. No, it did not. The Due Process Clause requires the government to give notice and an opportunity to be heard before depriving anyone of liberty or property. Arguably, an aspiring doctor has a protected interest in finishing her medical education at a public university. *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84 (1978). But a public university need afford that student only "minimal" process before "dismiss[ing]" her "on academic grounds." *Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 298 (6th Cir. 2019) (quotation omitted). "This is especially true" as the student "advances through the varying regimes of the educational system, and the instruction becomes both more individualized and more specialized." *Horowitz*, 435 U.S. at 90.

Here, Wright State dismissed Dr. Mares for conceded unprofessionalism, which is an academic concern in the context of medical education. *See Al-Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355, 359–60 (6th Cir. 2015). Accordingly, Wright State owed Dr. Mares only minimal process. And Wright State afforded

Dr. Mares *a lot* of process, including progressive discipline, a hearing, and a written appeal. Wright State gave Dr. Mares all the process that was "due" to her under any conceivable standard.

Dr. Mares further argues that Wright State violated the Due Process Clause in a second way. Specifically, she says its decision to dismiss her violates the substantive component of the Due Process Clause, which forbids the government from taking an action for which "there is no rational basis." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) (quotation omitted). To describe this argument is to reject it. Given Dr. Mares's acknowledged misconduct, some of which arguably jeopardized patient safety, Wright State had good reason to dismiss Dr. Mares from its program.

In the end, and in light of the undisputed evidence, Dr. Mares's claim fails as a matter of law. The District Court thus correctly awarded summary judgment to the defendants. This Court should affirm.

## STATEMENT OF THE CASE

**1.** Medical residencies are a "crucial step" in the education of this country's doctors. Accreditation Requirements, R.54-25, PageID#2174. Residencies serve as a bridge "between medical school and autonomous clinical practice," with aspiring

doctors gradually receiving more responsibility for patient care while still learning from faculty physicians. *Id.*

To facilitate the residency process, a nonprofit organization—the Accreditation Council for Graduate Medical Education—sets accreditation standards for residency programs across the country. *See id.*, PageID#2172. Some accreditation standards set benchmarks for residency programs. One standard, for example, outlines the percentage of a program's residents that should ideally take and pass boards each year. *Id.*, PageID#2202–03. Other accreditation standards focus on the traits individual residents must exhibit to graduate from residency programs. *Id.*, PageID#2189–93. In addition to proving their medical knowledge and technical ability, medical residents must prove that they have the professionalism and communication skills necessary to work collaboratively with others. *Id.*, PageID#2189–92.

Many accreditation standards focus on the administration of residency programs. For instance, each educational institution that sponsors residency programs must have a "designated institutional official." *Id.*, PageID#2175. That official works with all the institution's residency programs to help ensure that programs remain accredited. Painter Depo., R.53, PageID#1690–91. Each residency program must also appoint a "clinical competency committee" that evaluates the pro-

gress of residents.  Accreditation Requirements, R.54-25, PageID#2197–99.  This committee—which consists of faculty inside and outside the residency program—reviews each resident's progress twice a year and provides input to the program. *Id.*  Finally, a residency program must designate a program director.  *Id.*, Page-ID#2178.  The program director is accountable for all aspects of the residency program.  *Id.*  Thus, the program director has primary responsibility for deciding whether a resident advances through the program. *Id.*, PageID#2179–80.

Wright State University is committed to graduate medical education.  Consequently, Wright State's Boonshoft School of Medicine offers residency programs in more than a dozen specialties.  Resident Manual, R.54-23, PageID#2044.  Key here, Wright State offers a residency program in obstetrics and gynecology ("OB/GYN").  *See* OB/GYN Program Manual, R.54-24, PageID#2111–71.  Every year this program selects six new residents:  three civilian and three military.  *Id.*, PageID#2116; Talbot Depo., R.54, PageID#1759.  Wright State "oversees the education and training of" these residents, but it does "not employ the residents." Talbot Depo., R.54, PageID#1763–64.  Instead, Miami Valley Hospital employs the civilian residents, while the military employs the military residents.  *Id.*, Page-ID#1763.  Notwithstanding these distinctions, all of the program's residents train at both Miami Valley Hospital and the Wright-Patterson Medical Center.  *See id.*,

PageID#1764; OB/GYN Program Manual, R.54-24, PageID#2116–17. Wright State's OB/GYN residency program lasts four years, with residents receiving more responsibilities as they progress through the program. *See* OB/GYN Program Manual, R.54-24, PageID#2127–30, 2156–58. At "all levels" of the program, teaching medical students "is an essential component" of a resident's job. *Id.*, PageID#2147.

Wright State expects its residents "to develop and display impeccable professional attitudes and behaviors that meet the needs and expectations of the community and the medical profession." Resident Manual, R.54-23, PageID#2048. Wright State memorializes these expectations in a "Resident Manual," which it provides to each of its residents. *Id.*, PageID#2035–110; *see also* Mares Depo., R.52, PageID#901. The manual makes clear that, to advance in Wright State's residency programs, residents must "demonstrate the competency, efficiency, and maturity necessary to assume increasing responsibilities for teaching and supervising other residents, fellows, and students." Resident Manual, R.54-23, PageID#2048, 2077. Along similar lines, Wright State expects residents to prove over the course of their residencies that they have the "[i]nterpersonal and communication skills" needed to work effectively with "patients, their families, and other health professionals." *Id.*, PageID#2049.

The Resident Manual outlines the process—often called "Item 504" in the record—by which a residency program makes decisions about its residents. *Id.*, PageID#2077–79. Wright State retains the discretion to demote, deny promotion to, or terminate a resident from a residency program if, in its view, the resident fails to meet the program's expectations. *Id.*, PageID#2078. The director of each program makes these decisions, with input from the program's clinical competency committee. When a residency program plans on taking an adverse action against a resident, it must (1) notify the resident in writing of the intended action, (2) summarize the reasons for the action, and (3) inform the resident of the right to appeal the action. *Id.* Further, the program director must meet with the resident to discuss the matter and attempt to resolve "any disputed issues." *Id.* (The program director may also suspend the resident with pay while the program and resident contemplate next steps. *Id.* This paid suspension may last no longer than 60 days, which keeps the process moving. *Id.*)

A resident facing an adverse action may appeal the intended action and obtain a review. *Id.* This review proceeds as follows.

*First*, the resident may receive a hearing before a panel. *Id.* The panel consists of three faculty members, one of whom is chosen from a list of nominees the resident provides. *Id.* At the hearing, the program director presents the basis for

the program's intended action. *Id.* The resident may respond and present evidence. *Id.*, PageID#2079. The resident may also receive assistance from a faculty advisor. *Id.* Additionally, the resident's attorney may observe the proceedings. *Id.*, PageID#2078. The panel must decide whether "substantial evidence" supports the program's intended action. *Id.* And it must recommend the action that it thinks the residency program should take. *Id.*, PageID#2079.

*Second*, the panel's recommendation proceeds to an administrative-review phase. The dean of the Boonshoft School of Medicine and a representative of the resident's employing institution consider the panel's recommendation. *Id.* They then jointly decide whether to affirm the program's intended action, reject the intended action, or revise the intended action. *Id.*

*Third*, the resident may appeal to the provost of Wright State University. *Id.* This is the final level of review, and the resident receives a chance to explain in writing the action the resident requests and the reasons supporting that action. *Id.* Within roughly two weeks, the provost makes Wright State's final decision and notifies the resident. *Id.*

**2.** Jacquelyn Mares graduated from medical school in 2015. Mares Depo., R.52, PageID#876. She hoped to specialize in obstetrics and gynecology. To further that goal, she completed the first year of an OB/GYN residency program at

Hofstra University. *Id.*, PageID#875, 885. Dr. Mares applied to transfer into Wright State's OB/GYN residency program as a second-year resident. *Id.*, PageID#885–86. She interviewed with Dr. Michael Galloway—the program director at that time—and Wright State accepted her to fill a vacancy in its program. *Id.*, PageID#887–88.

Dr. Mares started at Wright State in the summer of 2016. *Id.*, PageID#888. From the outset, she understood that there was a "huge difference" between the residency programs at Hofstra and Wright State. *Id.*, PageID#889. First-year residents at Wright State performed a greater variety of procedures. *Id.*, PageID#890. Dr. Mares knew, therefore, that she "would have to work twice as hard to make up the differences." *Id.*

As part of her transition to Wright State, Dr. Mares entered into a "Resident-Fellow Agreement." R.54-1, PageID#1826–29. The agreement memorialized that Dr. Mares was an at-will employee of Miami Valley Hospital. *Id.*, PageID#1826. It further explained that Dr. Mares's "[a]cademic progress and completion of" her residency program were at "the sole discretion" of her program director and the clinical competency committee. *Id.*, PageID#1828. Dr. Mares also signed a "Graduate Medical Education Agreement" that incorporated the standards from Wright State's Resident Manual. R.54-2, PageID#1830.

11

**3.** Dr. Mares began with Wright State as a second-year resident. The school dismissed her in her fourth year of residency. Each year of her tumultuous residency deserves its own discussion.

*Dr. Mares as a second-year resident.* Dr. Mares's initial rotations yielded mixed reviews. After her first rotation at Miami Valley Hospital, Dr. Galloway reported that Dr. Mares had a solid knowledge base, but that she needed to improve her surgical skills. Ex. I, R.52-26, PageID#1318. Another weakness, Dr. Galloway noted, was Dr. Mares's communication with peers and senior residents. *Id.*, PageID#1319. Attending physicians stressed that Dr. Mares "needs to 'know what she doesn't know.'" *Id.* Dr. Mares received similar feedback after her next rotation, which was at Wright-Patterson Medical Center. Dr. Nancy Lo, who supervised residents at the Air Force Base, remarked that Dr. Mares was efficient. Ex. J. R.52-28, PageID#1322. But Dr. Mares needed to improve in several areas, including accepting input from faculty "in a constructive manner." *Id.*

Over time, criticism began to mount. In early 2017, the clinical competency committee for Dr. Mares's residency program first evaluated Dr. Mares. Ex. K, R.52-30, PageID#1324. The committee expressed concerns about Dr. Mares's "professionalism in relating to students, nurses and other residents." *Id.* The committee encouraged Dr. Mares to have more "patience" with medical students,

12

to strive for "positive interactions with nursing and senior residents," and "to embrace collaboration with those around her." *Id.* Dr. Galloway shared the committee's thoughts with Dr. Mares. Mares Depo., R.52, PageID#926–28.

Separate concerns soon arose regarding "student mistreatment." Ex. L, R.52-32, PageID#1326. Several medical students offered scathing reviews of Dr. Mares. Ex. MMM, R.52-37, PageID#1335–36. One student described her as "a malignancy to the program." *Id.* Another accused Dr. Mares of "atrocious hazing." *Id.* Another reported that Dr. Mares "is a terrible human most of the time." *Id.* Two others recalled Dr. Mares announcing: "I don't work with medical students." *Id.* For context, other residents received negative reviews too. But Dr. Mares's negative reviews far outpaced the field. Wright State's OB/GYN program has twenty-four residents at any given time. During the relevant evaluation period, Dr. Mares received more negative complaints than all of the other residents combined. Hearing Tr., R.54-26, PageID#2279. Dr. Galloway informed Dr. Mares about the negative student feedback. He told her that the feedback signaled "a problem that we need to fix." Mares Depo., R.52, PageID#933–36.

The next spring, faculty continued to question Dr. Mares's professionalism. By that time, Dr. Mares was being "labeled" as "over confident and under-skilled and not realizing her limitations." Ex. M, R.52-35, PageID#1332. Dr. Mares also

received another evaluation of her performance at Wright-Patterson Medical Center. Dr. Lo identified multiple instances where Dr. Mares failed to communicate properly with her attending physicians about patient care. Ex. N, R.52-38, PageID#1337. More generally, Dr. Lo commented that Dr. Mares needed to improve her "tone when communicating with … nurses and technicians." *Id.*

*Dr. Mares as a third-year resident.* Dr. Mares advanced to the role of third-year resident. Ex. O, R.52-41, PageID#1340. But the clinical competency committee noted its concerns about Dr. Mares's "overall professionalism, specifically with respect to communication with colleagues, nursing, and faculty." *Id.* The committee informed Dr. Mares that it expected "to see progression on these fronts if" she wished "to complete the program on schedule." *Id.*

To drive home the point, Dr. Galloway gave Dr. Mares a formal letter of warning in May 2017. Ex. P, R.52-43, PageID#1346. He warned Dr. Mares that she needed "significant improvement" in her professionalism, and that she needed to show improvement "now." *Id.* He further explained that Dr. Mares's "demeanor, attitude, [and] willingness to be responsive" posed "a major concern." *Id.* Dr. Galloway required Dr. Mares to begin monthly mentoring with Dr. David McKenna, a member of Wright State's faculty. *Id.*, PageID#1347. At Dr. McKenna's recommendation, Dr. Mares also received mentorship from Dr. Christopher

Croom.  Mares Depo., R.52, PageID#958.  Dr. Mares understood, at the time she received this warning letter, that she was at risk of being placed on probation. Mares Depo., R.52, PageID#956.

Dr. Mares's problems escalated nonetheless.  A few months after receiving the warning letter, Dr. Mares by her own admission had an "unprofessional" inter-action with her chief resident, Dr. Lisa Ng.  *Id.*, PageID#969; *see also* Ex. Q, R.52-45, PageID#1350–51.  Dr. Mares received a call that a patient was bleeding shortly before the end of her shift.  Mares Depo., R.52, PageID#966.  Rather than checking on the patient herself, Dr. Mares had a nurse do so.  *Id.*  Dr. Ng informed Dr. Mares that she should have personally checked on the patient.  *Id.*  As it turned out, the patient needed a delivery.  Dr. Mares lost her temper.  She told Dr. Ng, "you can deliver the baby," and left the delivery room.  *Id.*, PageID#967.

After this incident, Dr. Galloway suspended Dr. Mares for five days.  Ex. Q, R.52-45, PageID#1350–51.  He noted that there had been other recent occasions where Dr. Mares's attitude caused "a slight delay in the diagnosis and subsequent care of a patient."  *Id.*  Dr. Mares received a chance to comment on her suspension but chose not to.  *Id.*  Dr. Galloway also gave Dr. Mares the phone number for a confidential emotional-assistance program.  Mares Depo., R.52, PageID#972–73.

Dr. Mares initially called the number, but she then decided that she needed no assistance. *Id.*, PageID#973–74.

Dr. Mares's evaluations varied following her suspension. In the fall of 2017, the clinical competency committee thought Dr. Mares's attitude was improving. Ex. U, R.52-55, PageID#1475. But the committee's next evaluation remarked that Dr. Mares's behavior really "depend[ed] on the day." Ex. W, R.52-59, PageID#1483. In November, Dr. Galloway again reprimanded Dr. Mares because of her treatment of medical students, based on student reports of "unethical behavior." Ex. V, R.52-57, PageID#1478. A few months later, Dr. Galloway gave Dr. Mares a relatively positive review, though reinforcing her need "to work on communication in stressful situations." Ex. X, R.52-61, PageID#1486–89.

Other feedback from this timeframe was more negative. Dr. Lo described that Dr. Mares was making it "very obvious" that she no longer wished to be at Wright-Patterson Medical Center, showing "outward signs" of "disengagement from patient care." Ex. Y, R.52-63, PageID#1493. For example, Dr. Mares sometimes left her shifts by announcing that "everyone is fine" rather than giving her colleagues specific reports about the status of patients. *Id.*, PageID#1495.

Dr. Galloway decided to place Dr. Mares on probation in March 2018. Ex. Z, R.52-65, PageID#1676–77. He informed Dr. Mares that her "demeanor, atti-

tude, and willingness to be responsive remain a major concern." *Id.*, PageID#1676. He emphasized that poor communication has "a negative effect on transitions of patient care" and thus affects "patient safety." *Id.* Dr. Galloway informed Dr. Mares of her right to appeal the probation decision. *Id.*, PageID#1677. But Dr. Mares chose not to appeal. Mares Depo., R.52, PageID#1010. Dr. Mares understood, by this time, that she faced a serious threat of dismissal. *Id.*, PageID#1012.

Another notable incident occurred in May 2018. Within a patient safety report, a member of the staff at Wright-Patterson Medical Center complained about Dr. Mares's conduct, including her lack of communication with nursing staff. Ex. BBBB, R.52-8, PageID#1269–70. (By way of background, "patient safety reports" are daily reports highlighting issues in patient care needing improvement. Painter Depo., R.53, PageID#1717.) According to the staff member, Dr. Mares falsely suggested that she examined the patient. Ex. BBBB, R.52-8, PageID#1269. Dr. Mares received a chance to comment on this accusation; she said that she mistakenly thought that a nurse performed the exam. *Id.*, PageID#1272. Following the incident, Dr. Lo reached out to Dr. Mares to see if the two of them could "work out a plan," as it was apparent to Dr. Lo that Dr. Mares did not want to be at Wright-Patterson Medical Center. *Id.*, PageID#1274.

*Dr. Mares as a fourth-year resident.*  In July 2018, Dr. Theodore Talbot took over as the program director for Wright State's OB/GYN residency program.  Talbot Depo., R.54, PageID#1749.  Soon after, he promoted Dr. Mares to the role of fourth-year resident.  Ex. EE, R.52-16, PageID#1289.  Dr. Talbot hoped he would be able to take Dr. Mares off probation by the end of the year.  *Id.*

For a while, that hope seemed realistic.  Shortly after promoting Dr. Mares, Dr. Talbot reported that she had shown "dramatic improvement" in her professionalism during her last rotation.  Ex. FF, R.52-19, PageID#1306.  At the time, Dr. Mares was uncertain as to whether she would go into clinical practice.  *Id.*  Dr. Talbot encouraged Dr. Mares to sit for boards, as he thought that would give her the most options going forward.  *Id.*, PageID#1307.  But regardless of Dr. Mares's future plans, Dr. Talbot planned to take Dr. Mares off probation in December if she continued her improved behavior.  *See id.*

Unfortunately, Dr. Mares's improvement proved fleeting, as she soon had several more run-ins with colleagues and patients.  For example, in early September 2018, Dr. Mares "exploded" at operating-room staff for the cancelation of a patient's surgery.  Mares Depo., R.52, PageID#1031; *see also* Ex. GG, R.52-22, PageID#1311.  A few weeks later, Dr. Mares had problems with a patient's mother, who wanted her daughter admitted to the hospital.  *See* Ex. HH, R.52-24, Page-

ID#1313–14; Mares Depo., R.52, PageID#1039–42.  When later asked to help with the patient, Dr. Mares avoided further involvement.  *See* Ex. QQ, R.52-46, Page-ID#1352–53; Hearing Tr., R.54-26, PageID#2334.  At least one faculty member—Dr. Kindig—thought that Dr. Mares's behavior on this occasion raised concerns about "patient abandonment."  Ex. QQ, R.52-46, PageID#1353.  Finally, at the beginning of October, Dr. Mares refused to perform a cesarean section on a patient she believed was psychotic.  Mares Depo., R.52, PageID#1052–53.  Dr. Jerome L. Yaklic, the chair of Wright State's OB/GYN department, was involved in this final incident.  In his view, the manner in which Dr. Mares refused to operate was both "very concerning and highly unprofessional."  Ex. II, R.52-27, PageID#1320; *see also* Yaklic Depo., R.55, PageID#2419, 2434.

**4.**  Wright State decided to dismiss Dr. Mares from its residency program. Consistent with the review process described above, *see* Resident Manual, R.54-23, PageID#2077–79, Wright State reached its decision in numerous steps.

*Step 1: Committee recommendation.*  The clinical competency committee met to discuss Dr. Mares, including the "numerous recent incidents" where her behavior raised professionalism concerns.  Ex. NNN, R.52-40, PageID#1339.  After the matter was "discussed at length" with "much debate," the committee recommended, by a six-to-two vote, dismissing Dr. Mares from her residency program.

*Id.* (One of Dr. Mares's mentors, Dr. McKenna, served on the committee and voted for dismissal. He later suggested, however, that he would have voted differently if he had more information about recent incidents involving Dr. Mares. Ex. 28, R.51-1, PageID#834.)

The next day, Dr. Talbot met with Dr. Mares to discuss the committee's recommendation and to hear her side of recent events. Ex. II, R.52-27, Page-ID#1320–21. Dr. Mares chose, by and large, not to engage with Dr. Talbot during the meeting. *See id.*; Mares Depo., R.52, PageID#1056–57; Ex. JJ, R.52-29, Page-ID#1323; Hearing Tr., R.54-26, PageID#2355.

*Step 2: Program-director decision.* Dr. Talbot met with Dr. Mares again a few days later, with Dr. Yaklic present. Dr. Talbot informed Dr. Mares that he decided to accept the committee's recommendation of dismissal. Ex. LL, R.52-33, Page-ID#1328. Dr. Mares's recurring problems with professionalism, Dr. Talbot explained, jeopardized both patients and the reputation of the residency program. *Id.* Dr. Talbot also relayed the perception of several faculty members, which was that Dr. Mares was "marching time toward graduation" in a manner that negatively affected her patient care. *Id.* Dr. Mares voiced her disagreement with Dr. Talbot's assessment, but she remained mostly noncommunicative. *Id.* The same day, Dr. Talbot provided Dr. Mares with written notice of his dismissal decision. Ex. KK,

R.52-31, PageID#1325.  The notice described that Dr. Mares's "professionalism and communication" were "unsatisfactory."  *Id.*  It further informed Dr. Mares of her ability to appeal and receive further review of the decision.  *Id.*  The school placed Dr. Mares on paid administrative leave.  *Id.*

*Step 3:  Panel hearing.*  Dr. Mares appealed her dismissal and received a hearing before a panel of three faculty members.  The selected panel members included one of Dr. Mares's mentors, Dr. Croom, whom Dr. Mares had nominated to serve on the panel.  Mares Depo., R.52, PageID#1071.  Dr. Albert F. Painter—Wright State's designated institutional official at the time, *see above* 6—presided over the hearing as a neutral facilitator.  Painter Depo., R.53, PageID#1695, 1709–10.  Before the hearing, Dr. Talbot shared with Dr. Mares a summary of the concerns and incidents that led to his decision.  Ex. TT, R.52-54, PageID#1471–73.

At the hearing, Dr. Talbot presented his reasons for dismissing Dr. Mares from the program, with assistance from Dr. Yaklic.  Hearing Tr., R.54-26, PageID#2224–403.  Dr. Talbot stressed that "the main issue holding [Dr. Mares] back was professionalism."  *Id.*, PageID#2235.  In addition to having issues with medical students, Dr. Mares had issues with nurses, junior residents, senior residents, and faculty.  *Id.*, PageID#2281; *see also id.*, PageID#2268 (discussing nurse evaluations).  To illustrate, Dr. Talbot told of a time when he personally witnessed Dr. Mares be-

rate a junior resident (bringing the resident to tears) over a minor scheduling issue. *Id.*, PageID#2262.  In the end, Dr. Talbot said, Dr. Mares's behavior was too "unpredictable" and "inconsistent" to allow her to continue in the residency program. *Id.*, PageID#2245–46.

Notably, the panel was curious to know whether, given accreditation standards, *see above* 6, Dr. Mares's reluctance to sit for boards influenced the dismissal decision.  Dr. Yaklic explained that, in his view, that issue did not "play[] directly" into the dismissal decision.  Hearing Tr., R.54-26, PageID#2259–60.  Dr. Talbot did not suggest any disagreement with that assessment.  The concern in his view was more general, as he questioned Dr. Mares's overall "commitment to the field."  *Id.*, PageID#2251.

At Dr. Mares's request, Dr. Melanie Glover—a faculty advisor—acted as an advocate for Dr. Mares at the hearing.  *Id.*, PageID#2284.  Dr. Glover argued that physician burnout likely affected Dr. Mares's conduct.  *Id.*, PageID#2304–05.  She also suggested that the program could have done more to assist Dr. Mares in improving her behavior.  *Id.*, PageID#2304, 2322–23.  Further, Dr. Glover offered additional context for some incidents.  *Id.*, PageID#2316–18.  But Dr. Glover did not go so far as to argue that Dr. Mares had done nothing wrong:  she instead stressed

that Dr. Mares was "remorseful and realized her behavior was inappropriate." *Id.*, PageID#2298.

Dr. Mares also spoke for herself during the hearing. As a general matter, Dr. Mares "never denied that" the events leading to her dismissal "happened." *Id.*, PageID#2324. Dr. Mares likewise admitted that she was "completely atrocious to medical students" as a second-year resident. *Id.* Dr. Mares also conceded that during one recent incident involving a canceled surgery, *see above* 18, she "flew off the handle" at her colleagues, behaving in an "inappropriate and unacceptable" manner. Hearing Tr., R.54-26, PageID#2339. (Dr. Mares was also candid about her misconduct when texting with fellow residents near the time of her dismissal. In one text message, Dr. Mares said that her dismissal was "a long time coming and a lot of this bad stuff that they are pinning on me is actually true." Ex. RRR, R.52-49, PageID#1357. In another, Dr. Mares acknowledged, "The thing is they aren't wrong, I continue to get myself in sticky situations." *Id.*, PageID#1363.)

After the hearing, the panel recommended that Wright State give Dr. Mares one last chance to graduate. Ex. 16, R.54-16, PageID#1875–76. The panel recognized, however, that Dr. Mares's behavior warranted discipline. So it recommended that Dr. Mares remain on probation until graduation and that any "additional

infractions … result in immediate termination" from the residency program. *Id.*, PageID#1876.

*Step 4:  Administrative review.*  The panel's recommendation went to Dr. Margaret M. Dunn (the dean of the Boonshoft School of Medicine) and Dr. Teresa W. Zryd (a representative of Miami Valley Hospital) for further review.

The panel's recommendation drew sharp criticism from other faculty members.  A few days after the recommendation, Dr. Lo wrote to Dr. Yaklic on behalf of the faculty at Wright-Patterson Medical Center.  Ex. AAA, R.52-3, PageID#1231.  Dr. Lo stressed the faculty's "unanimous concerns" with Dr. Mares's continuing in the residency program.  *Id.*  The faculty at Wright Patterson, Dr. Lo reported, witnessed Dr. Mares "deliberately marginalize" medical students, "blatantly disregard" medical providers, and "knowingly provide false information in a patient safety report."  *Id.*  Thus, should Dr. Mares continue in the program, these faculty members preferred "that she not be allowed" back at Wright-Patterson Medical Center.  *Id.*

Drs. Dunn and Zryd decided to reject the panel's recommendation and affirm Dr. Mares's dismissal.  EX. BBB, R.52-7, PageID#1266.  Their decision was "based upon" Dr. Mares's "persistent" unprofessionalism towards "patients, faculty, supervisors, and learners."  *Id.*  Drs. Dunn and Zryd further emphasized

Dr. Mares's documented misconduct while on probation. *Id.* They also noted their concern about Dr. Mares's "entering incorrect information in a patient safety report." *Id.*

*Step 5: Provost review.* Finally, Dr. Mares appealed to Susan Edwards, Ph.D., who was at that time the provost of Wright State University. During this appeal, Dr. Mares was able to provide letters—from faculty and residents—in support of her remaining in the program. Ex. 28, R.51-1, PageID#829–42; Ex. 30, R. 51-3, PageID#848–62. Dr. Mares also submitted a written statement arguing against her dismissal. Ex. 29, R.51-2, PageID#843–47. Among other topics, Dr. Mares addressed the concern that she had provided false information in a patient-safety report. *Id.*, PageID#847; Mares Depo., R.52, PageID#1156–57.

Dr. Edwards affirmed the decision to dismiss Dr. Mares from the residency program. Ex. 18, R.54-18, PageID#1878. At her deposition, Dr. Edwards discussed her approach as Wright State's final decisionmaker. During her "lengthy" review process, she "read every piece of information that came in," including the panel-hearing transcript and the materials Dr. Mares provided in support of her appeal. Edwards Depo., R.51, PageID#796, 799. Dr. Edwards considered both whether Dr. Mares received a fair process and whether the outcome of that process was justified. *Id.*, PageID#798. In the end, Dr. Edwards stood by the dismissal decision.

*Id.*, PageID#804.  In her view, Dr. Mares's shortcomings with respect to "professionalism and interpersonal communication were key."  *Id.*, PageID#811.  And those shortcomings involved "multiple instances," not just "one instance," of misbehavior.  *Id.*, PageID#804.

As part of her review, Dr. Edwards considered the panel's recommendation of lesser discipline.  That recommendation was "not workable" in Dr. Edwards's estimation.  *Id.*, PageID#807.  It was not sound academic practice to graduate a resident who still "needs to be on probation" at the time of graduation.  *Id.*, PageID#801–02.  Further, Dr. Mares had already received "feedback along the way" and she had failed to correct her behavior.  *Id.*, PageID#805.  Thus, Dr. Mares's dismissal was necessary "to ensure that anyone associated with" Wright State's medical program is both competent and professional.  *Id.*

5.  Dr. Mares filed this lawsuit in November 2020, suing Wright State University along with Drs. Painter, Talbot, and Yaklic.  Compl., R.1, PageID#2.  She claims that these Wright State defendants violated her rights to procedural due process and substantive due process under the Fourteenth Amendment to the United States Constitution.  Am. Compl., R.39, PageID#582–83.  She sued Drs. Painter, Talbot, and Yaklic in their individual and official capacities, seeking both money damages and injunctive relief.  *Id.*, PageID#578, 583–84.  Dr. Mares also

raised an equal-protection claim in the District Court, though she has now abandoned it.  Mares Br.4.

Dr. Mares additionally sued Miami Valley Hospital and its healthcare system, Premier Health Partners.  Am. Compl., R.39, PageID#578.  She claims that those defendants breached contract agreements.  *Id.*, PageID#582–83.  (Dr. Mares abandoned any breach-of-contract claim against Wright State University during proceedings below.  Order, R.69, PageID#2825; Pl. Memo. Opp'n, R.29, PageID#219; *accord* Mares Br.4.)

After discovery, the District Court granted summary judgment to the defendants and terminated the case.  Order, R.69, PageID#2839.

The District Court first rejected Dr. Mares's procedural-due-process claim.  Under the Fourteenth Amendment's Due Process Clause, a person cannot be deprived of a protected interest without adequate process.  *Id.*, PageID#2827–28.  The District Court accepted that Dr. Mares had a protected interest in her continued enrollment in her residency program.  *Id.*, PageID#2829.  But Dr. Mares's interest in her residency was academic in nature—it was not an employment interest.  *Id.* (collecting authority).  The District Court therefore applied the due-process "framework governing students' claims," which requires only "minimal" process "for academic dismissals."  *Id.*, PageID#2829–31.  Dr. Mares's dismissal readily

satisfied that standard, as Wright State "fully informed" Dr. Mares of its dissatis-faction with her performance and then made a "careful and deliberate decision to dismiss her." *Id.*, PageID#2832 (quotation omitted). The court further explained that, even assuming Dr. Mares was entitled to more process than the typical student, Wright State's review process met constitutional requirements. *Id.*; *see also id.*, PageID#2833 n.10.

The District Court next rejected Dr. Mares's substantive-due-process claim. *Id.*, PageID#2834–35. Dr. Mares argued below that her dismissal was conscience shocking and thus violated her right to substantive due process. That claim failed because the record—even when construed in Dr. Mares's favor—did not support any finding of conscience-shocking behavior. *Id.*, PageID#2834–35. Rather, the record established "beyond dispute" that Wright State had legitimate concerns about Dr. Mares's "unprofessional conduct." *Id.*, PageID#2834.

## SUMMARY OF ARGUMENT

Wright State University is an arm of the State of Ohio. Ohio Rev. Code §3345.011; *see also McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012). Sovereign immunity thus bars any claims Dr. Mares brings directly against Wright State. *See Laborers' Int'l Union, Local 860 v. Neff*, 29 F.4th 325, 330 (6th Cir. 2022). As to the remaining "Wright State defendants"—namely, Drs. Painter,

Talbot, and Yaklic—Dr. Mares's claims fail as a matter of law based on facts that are not in dispute.

**I.**    The Due Process Clause guarantees "due process of law."  U.S. Const. amend XIV.  This guarantee has both procedural and substantive components. *Reno v. Flores*, 507 U.S. 292, 302 (1993); *Golf Vill. North, LLC v. City of Powell*, 42 F.4th 593, 598 (6th Cir. 2022).  The Wright State defendants, in dismissing Dr. Mares from her residency program, did not violate either component.

**A.**    Procedural due process requires that "the government provide fair procedure when depriving someone of life, liberty, or property."  *Golf Vill. North, LLC*, 42 F.4th at 598 (quotation omitted).  The analysis has "two steps." *Kaplan v. Univ. of Louisville*, 10 F.4th 569, 577 (6th Cir. 2021).  *First*, a court considers whether the plaintiff has a constitutionally protected liberty or property interest. *Id.  Second*, if a protected interest is at stake, a court considers "the procedures necessary to protect that interest." *Id.*

The amount of process due depends on the situation.  A public university must afford a graduate student only "minimal" process before dismissing the student on academic grounds. *Endres*, 938 F.3d at 298 (quotation omitted).  That is, a university must simply "provide the student with notice of his unsatisfactory academic performance and deliver a careful and deliberate decision on the student's

29

fate." *Id.* (quotation omitted).  In the medical field, evaluation of a student's "professionalism" is "an academic matter." *Id.* at 299.

In this case, even assuming Dr. Mares had a protected interest in her continued medical education, Wright State afforded her more than enough process before dismissing her from its residency program.  A medical residency is an academic program. *Shaboon v. Duncan*, 252 F.3d 722, 729 (5th Cir. 2001).  And Dr. Mares was not an employee of Wright State.  Talbot Depo., R.54, PageID#1763–64.  Further, Wright State dismissed Dr. Mares on academic grounds:  it determined that she lacked the professionalism and communication skills needed to perform competently as a doctor.  *See, e.g.*, Edwards Depo., R.51, PageID#805.  Dr. Mares was thus entitled to only "minimal" process, in the form of "notice" and a "careful and deliberate decision." *Endres*, 938 F.3d at 298 (quotation omitted).

Wright State afforded Dr. Mares far more process than that.  Among other things, Dr. Mares received a hearing at which she was able to present evidence.  And, before her final dismissal, Dr. Mares was able to appeal her residency program's decision to the provost of Wright State.  All told, fifteen doctors formally reviewed Dr. Mares's situation and weighed in on whether Wright State should give her another chance to graduate.  Given Dr. Mares's lengthy history of unpro-

fessionalism, most reviewers decided that it was time for Dr. Mares to go.  Their decision in no way offends the Due Process Clause.

**B.**  Substantive due process typically bars government conduct that infringes on a person's fundamental rights.  *Reno*, 507 U.S. at 302.  Fundamental rights are a narrow category of rights, capturing only interests "so rooted in the traditions and conscience of our people as to be fundamental."  *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003).  When no fundamental right is at stake, substantive due process merely prohibits egregious government conduct that shocks the conscious.  *See Range v. Douglas*, 763 F.3d 573, 589–90 (6th Cir. 2014).

Here, no fundamental right is at stake.  *See Doe v. Miami Univ.*, 882 F.3d 579, 598 (6th Cir. 2018).  And Dr. Mares's dismissal for unprofessional behavior is not the type of extreme government conduct that shocks the conscious.  Thus, Dr. Mares's substantive-due-process claim fails.  Indeed, her claim is barred by circuit precedent, under which students who challenge their dismissal from a public university on substantive-due-process-grounds must prove that the decision is completely unsupported by reason.  *Bell*, 351 F.3d at 251.  Given Dr. Mares's repeated instances of misconduct, she cannot make that showing.

**II.**  "The doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 12 (2021) (quotation omitted). Here, even if some aspect of Dr. Mares's case were to survive this appeal, the individual Wright State defendants are entitled to qualified immunity from Dr. Mares's claim for money damages. Because principles of due process leave educators broad freedom to decide who is qualified to become a doctor, *see Horowitz*, 435 U.S. at 90, the individual defendants did not violate any *clearly established* due-process principle.

## STANDARD OF REVIEW

"Summary judgment is appropriate when 'no genuine dispute as to any material fact' exists and the moving party 'is entitled to judgment as a matter of law.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). The Court reviews *de novo* the question of whether summary judgment was proper. *Id.* "At the summary judgment stage, the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Id.* (quotation omitted).

## ARGUMENT

Wright State dismissed Dr. Mares from its residency program because she was repeatedly unprofessional. It abided by the Constitution's demands in doing

so.  Because that follows as a matter of law from the undisputed facts, the District Court correctly awarded summary judgment to the defendants.

Before diving in, some quick jurisdictional housekeeping.  "When the States entered the federal system, they did so with their sovereignty intact."  *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2258 (2021) (quotation omitted).  As a result, sovereign immunity generally protects non-consenting States from lawsuits in federal court—regardless of whether those lawsuits pursue monetary or injunctive relief.  *Neff*, 29 F.4th at 330.

In this case, Dr. Mares brought claims directly against Wright State University.  Am. Compl., R.39, PageID#576, 578, 582–84.  But Wright State is an arm of Ohio.  Ohio Rev. Code §3345.011; *see also McCormick*, 693 F.3d at 661.  And Ohio has not consented to this lawsuit.  *See Jones v. Hamilton Cnty. Sheriff*, 838 F.3d 782, 786 (6th Cir. 2016).  Wright State is thus immune from Dr. Mares's claims.

When Wright State pointed all of this out below, Dr. Mares denied suing Wright State "itself," insisting that she was instead suing the University's doctors in their official and individual capacities.  Pl. Resp., R.13, PageID#90–91.  But Dr. Mares has continued to identify Wright State as a separate party within appellate filings.  *E.g.*, Civil Appeal Statement, Doc.12; Mares Br.4, 12.  To the extent Dr.

Mares now seeks relief directly against Wright State, she forfeited the chance to do so. In any event, sovereign immunity blocks any such claim.

## I.    The Wright State defendants did not violate Dr. Mares's due-process rights.

Dr. Mares argues that the remaining Wright State defendants violated her Fourteenth Amendment rights to procedural and substantive due process. She is wrong.

### A.    Dr. Mares's procedural-due-process claim fails.

Dr. Mares's principal claim is that the Wright State defendants violated her right to procedural due process. That claim fails as a matter of law.

#### 1.    Students are entitled to only minimal process if dismissed from an educational program due to underperformance.

The Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV. This language requires that "the government provide fair procedure when depriving someone of life, liberty, or property." *Golf Vill. North, LLC*, 42 F.4th at 598 (quotation omitted). To prove a violation of procedural due process, a plaintiff must show that she was deprived of a protected interest without adequate process. *Id.*

This Court generally addresses procedural-due-process claims "in two steps." *Kaplan*, 10 F.4th at 577. *First*, the Court considers "whether a constitutionally protected property [or liberty] interest is at stake." *Id.* This case involves property interests only. And property interests derive not from the Constitution, but from "independent sources of entitlement such as state law or a contract." *Id.* Thus, courts looking for a property interest must ask whether state law gives the plaintiff some "legitimate claim of entitlement." *Id.* at 578 (quotation omitted). A plaintiff's "unilateral expectation" or "abstract need or desire" is not enough. *Id.* (quotation omitted).

*Second*, when a protected interest does exist, courts ask whether the defendant provided "the procedures necessary to protect" that interest. *Id.* at 577. Generally speaking, due process requires notice and an opportunity to be heard before being deprived of a protected interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). But due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quotation omitted). Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

35

Thus, the amount of process due depends on context.  Consider, for example, a public employee who can be fired only for cause.  In that scenario, the employer—before terminating the employee—must provide the employee with notice of the reasons for termination, an explanation of the evidence, and "an opportunity for the employee to tell his side of the story."  *Gilbert*, 520 U.S. at 929.  This does not require a high degree of formality:  a public employer can satisfy these requirements through an informal meeting between an employee and the employee's supervisor.  *See Loudermill v. Cleveland Bd. of Ed.*, 844 F.2d 304, 311 (6th Cir. 1988).

In comparison, the due-process standards for students are less stringent.  *Elmark v. Matthews*, 524 F. App'x 62, 63–64 (5th Cir. 2013).  When students are dismissed from academic programs, courts distinguish "between dismissals for disciplinary misconduct and dismissals for academic underperformance."  *Endres*, 938 F.3d at 297.  For disciplinary actions, a student "must be given *some* kind of notice and afforded *some* kind of hearing."  *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (emphasis in original).  As the italicized words imply, the exact level of notice and hearing depends on the circumstances.  But a school can often meet these requirements through "informal give-and-take between student and disciplinarian," so long as the student has a fair chance "to present his side of the story."  *Id.* at 581, 584.

For dismissals on academic grounds, due-process requirements are even more "minimal." *Endres*, 938 F.3d at 298 (quotation omitted).  No hearing is required. *Id.*  A university must simply "provide the student with notice of his unsatisfactory academic performance and deliver a 'careful and deliberate' decision on the student's fate." *Id.* (quoting *Ku v. Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003)).  Applying this lesser standard to academic performance makes sense.  "Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which [courts] have traditionally attached a full-hearing requirement." *Horowitz*, 435 U.S. at 89.  Such decisions instead involve "subjective" evaluation of "cumulative information." *Id.* at 90.  In these situations, courts should not upset "the historic judgment of educators" by demanding formalized proceedings. *Id.*; *accord Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985).  "This is especially true as one advances through the varying regimes of the educational system, and the instruction becomes both more individualized and more specialized." *Horowitz*, 435 U.S. at 90.

"[T]he boundary between disciplinary misconduct and unsatisfactory performance can be hazy." *Endres*, 938 F.3d at 298.  After all, much more than just grades "dictate a student's prospects for success in his chosen field." *Id.*  The Su-

preme Court has recognized that academic performance includes whether a medical student is "making insufficient progress" in her clinical performance. *Horowitz*, 435 U.S. at 90. And this Court has repeatedly recognized that "professionalism" is "an academic matter" in determining who is qualified to be a doctor. *Endres*, 938 F.3d at 299; *see also Al-Dabagh*, 777 F.3d at 359–60; *Ku*, 322 F.3d at 436–37. Said another way, distinguishing between disciplinary dismissals and academic dismissals turns on the nature of the inquiry. A disciplinary decision involves "first-level factfinding" to decide, as an objective matter, whether a particular instance of misconduct occurred. *Endres*, 938 F.3d at 300. Academic decisions, on the other hand, involve a "subjective, expert evaluation as to whether" a student possesses "the necessary traits to succeed in" a given profession or field. *Id.* at 300–01 (quotation omitted). Those decisions typically involve an "evaluation of cumulative information," not a single event. *Horowitz*, 435 U.S. at 90.

Two final principles are worth keeping in mind. First, the right to due process is not a right to *perfect* process—not every error violates the charter of our liberties. *See Doe v. Cummins*, 662 F. App'x 437, 451 (6th Cir. 2016). Second, the Constitution guarantees adequate *process*, not "a favorable outcome." *Calderone v. City of Chicago*, 979 F.3d 1156, 1166 (7th Cir. 2020). Thus, whether the government satisfied the demands of due process "does not turn on the result obtained in

any individual case." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985).

### 2.    Dr. Mares received sufficient process.

Here, the record shows, beyond any legitimate dispute, that Dr. Mares received more than enough process to satisfy the Due Process Clause.

Begin with whether Dr. Mares had a protected interest at all.  The Supreme Court has not yet decided whether a student enrolled in post-secondary education has a protected interest in remaining enrolled. *Horowitz*, 435 U.S. at 84; *Ewing*, 474 U.S. at 222–23.  But this Court's holdings say, with little analysis, that a student enrolled in higher education does possess such an interest.  *See, e.g.*, *Endres*, 938 F.3d at 297; *Flaim v. Med. College of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005).  The Court's holdings are questionable.  As a practical matter, not all students who enroll in higher education receive degrees.  *See* Melanie Hanson, *College Dropout Rates*, Education Data Initiative (June 17, 2022), https://perma.cc/R76Q-MC7W. And academic evaluations—particularly for "specialized" advanced degrees—are largely "subjective" in nature.  *See Horowitz*, 435 U.S. at 90.  Thus, an aspiring doctor (advancing through the various stages of education it requires to practice medicine) has no "legitimate claim of entitlement" to reach the finish line.  *See Kaplan*, 10 F.4th at 578.  If anything, Dr. Mares's expectations were even lower

than the typical student: she joined Wright State's residency program knowing that she was starting from behind, *above* 11, and that her academic progress and graduation were at the "sole discretion" of her residency program, Resident-Fellow Agreement, R.54-1, PageID#1828. All told, while acknowledging this Court's contrary, binding precedent, the Wright State defendants preserve for *en banc* and Supreme Court review the argument that medical students have no protected interest in remaining enrolled in their programs.

Assuming that Dr. Mares possessed a protected interest, the next step is to classify her situation, so as to pin down the amount of process due to her. A medical residency is an academic program. Its primary purpose is "the academic training and academic certification for successful completion of the program." *Shaboon*, 252 F.3d at 729 (quoting *Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989)); *see also Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005); *Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 785 (2d Cir. 1991). Dr. Mares was not Wright State University's employee. Talbot Depo., R.54, PageID#1763–64. Dr. Mares was instead participating in one of Wright State's "graduate medication education" programs. Resident Manual, R.54-23, PageID#2039. Her goal was to "progress through a structured educational environment," with "faculty" supervision, until she was ready to practice medicine independently upon "graduation." OB/GYN

Program Manual, R.54-24, PageID#2117–18.   In short, the relationship between Wright State and Dr. Mares was that of a university and its student.

Moving down another level of classification, Dr. Mares's dismissal "falls within the ambit of an academic dismissal."   *See Fenje*, 398 F.3d at 625.   Dr. Mares's dismissal from Wright State was not about "first-level factfinding" as to whether certain events did or did not occur.   *See Endres*, 938 F.3d at 300.   Indeed, Dr. Mares openly conceded at her panel hearing that the many events leading to her dismissal "happened."   Hearing Tr., R.54-26, PageID#2324.   Rather, Wright State was evaluating, based on over two years of experiences with Dr. Mares, whether Dr. Mares possessed the professionalism and communication skills needed to perform acceptably as an OB/GYN.   *See, e.g.*, *id.*, PageID#2245; Ex. LL, R.52-33, PageID#1328.   That is the type of "subjective and evaluative" decision that "requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking."   *Horowitz*, 435 U.S. at 90.

Because Wright State dismissed Dr. Mares for academic underperformance, Mares was entitled to "minimal" process.   *Endres*, 938 F.3d at 298 (quotation omitted).   Wright State needed to provide Dr. Mares with notice of her unsatisfactory performance and then deliver "a careful and deliberate" decision.   *Id.* (quota-

tion omitted).  Wright State easily crossed that threshold.  Wright State notified

Dr. Mares in a variety of ways that it was dissatisfied with her professionalism and

communication skills.  And Wright State's dismissal process included five levels of

review:  (1) committee recommendation, (2) program-director decision, (3) panel

recommendation, (4) administrative review, and (5) provost review.  During those

stages, fifteen doctors considered, debated, and opined on Dr. Mares's fate.  All

agreed that her unprofessional behavior warranted significant discipline.  Most

agreed that it was time for her to leave the residency program.  (In total, ten of the

fifteen doctors who evaluated the situation voted to dismiss Dr. Mares, though Dr.

McKenna later regretted his vote.  *See above* 19–26.)

A closer look at Dr. Edwards's final review solidifies the careful and deliber-

ative nature of Wright State's decision.  She testified to conducting a "lengthy"

review, during which she read all the materials submitted to her, including the tran-

script of the panel hearing and the materials Dr. Mares submitted in support of her

continuance in the program.  Edwards Depo., R.51, PageID#796, 799.  Dr. Edwards

also considered the panel's recommendation of lesser discipline.  *Id.*, PageID#804,

807.  In light of her review, Dr. Edwards cogently explained the legitimate reasons

for dismissing Dr. Mares from the program.  Dr. Edwards emphasized Dr. Mares's

"multiple instances" of misbehavior, observing that she failed to correct her behav-

ior despite receiving warnings. *Id.*, PageID#804–05. And Wright State's reputation would be on the line, Dr. Edwards further explained, if it allowed this type of resident to graduate from its program. *Id.*, PageID#805. Dr. Mares is of course free to disagree with the substance of Dr. Edwards's decision. But nothing in this record comes even close to suggesting that Dr. Edwards reached that decision lightly or in a careless manner. It follows that Wright State afforded Dr. Mares sufficient process for an academic dismissal.

In truth, however, this case does not come down to how Dr. Mares's dismissal is classified. Even treating Dr. Mares's dismissal as for-cause termination of an employee, or as disciplinary action against a student, Dr. Mares still received enough process.

Return to the start. From the beginning of her time at Wright State, Dr. Mares received evaluations of her performance. Those evaluations flagged, early and often, Wright State's concerns about Dr. Mares's professionalism and communication skills. Dr. Mares then received progressive discipline—a letter of warning, a suspension, and probation—based on her unprofessional behavior. Ex. P, R.52-43, PageID#1346; Ex. Q, R.52-45, PageID#1350–51; Ex. Z, R.52-65, PageID#1676–77. Dr. Mares had the opportunity to appeal her probation, but she chose not to do so. Ex. Z, R.52-65, PageID#1676–77; Mares Depo., R.52, PageID#1010.

Thus, because of the events that preceded her dismissal, Dr. Mares was on notice of the faculty's concerns with her professionalism long before her dismissal.

Turn, then, to the process by which Wright State dismissed Dr. Mares. The record shows that Wright State complied with its internal review process. *See* Resident Manual, R.54-23, PageID#2077–79. That process gave Dr. Mares many chances to tell her "side of the story." *See Goss*, 419 U.S. at 581. For example, before Dr. Talbot accepted the committee's recommendation of dismissal, he met with Dr. Mares and gave her an opportunity to explain her side of events. Ex. II, R.52-27, PageID#1320. Rather than taking that opportunity, Dr. Mares chose to shut down. *See id.*; Mares Depo., R.52, PageID#1056–57; Ex. JJ, R.52-29, PageID#1323; Hearing Tr., R.54-26, PageID#2355. Even so, Dr. Mares received another chance to make her case at the panel hearing. Before that hearing, Dr. Talbot provided Dr. Mares with a summary of the various concerns and incidents that led to her dismissal. Ex. TT, R.52-54, PageID#1471–73. Then, during her hearing, Dr. Mares received the assistance of a faculty advisor, who argued passionately for lesser discipline. Hearing Tr., R.54-26, PageID#2284–323. Finally, when the matter made its way to Dr. Edwards for a final decision, Dr. Mares was able to submit a written argument against her dismissal, along with supporting letters from her fac-

ulty and fellow residents.  Ex. 28, R.51-1, PageID#829–42; Ex. 29, R.51-2, Page-

ID#843–47; Ex. 30, R.51-3, PageID#848–62.

This record leaves no doubt that Dr. Mares received ample notice and op-

portunity to be heard.  Procedural due process requires no more.

### 3.    Dr. Mares's contrary arguments are unpersuasive.

Dr. Mares does not dispute that she received a hearing and a written appeal

before her final dismissal from Wright State's residency program.  (Noticeably, Dr.

Mares's opening brief avoids any serious discussion of the underlying events that

led to her dismissal.  *Compare* Mares Br.7–8; *with above* 12–19.)  She insists, none-

theless, that Wright State did not give her enough process.  Her arguments do not

withstand scrutiny.

**a.**  Dr. Mares first challenges the District Court's characterization of her sit-

uation.  In her view, the court should have treated her as an employee, not a stu-

dent, for purposes of procedural due process.  Mares Br.13–14.  Dr. Mares, howev-

er, does not actually claim that she was Wright State's employee.  Indeed, Dr.

Mares concedes that her relationship with the University was "educational" and

"academic" in nature.  Mares Br.5–6.

Dr. Mares nonetheless points the Court to inapposite caselaw involving the

treatment of medical residents as employees.  Specifically, she directs the Court to

45

statutory cases about taxes and discrimination.  Mares Br.13–14 (citing *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44 (2011); *Khoiny v. Dignity Health*, 76 Cal. App. 5th 390 (Cal. App. Ct. 2022); *Boinapally v. Univ. of Tenn.*, 23 F. App'x 512 (6th Cir. 2001)).  Even if courts treat medical residents as employees in those contexts, it does not follow that they should do the same in the procedural-due-process context.  As alluded to already, in the due-process context, both the Fifth and Seventh Circuits have treated dismissals of medical residents as academic decisions.  *See Shaboon*, 252 F.3d at 729; *Fenje*, 398 F.3d at 625.  And the best guidance comes from *Horowitz*, 435 U.S. 78.  There, the Supreme Court recognized that, as graduate medical education becomes "more individualized and more specialized," the Due Process Clause affords educators greater latitude to make decisions, not less.  *Id.* at 90.  It would make little sense, under *Horowitz*'s logic, to give a medical resident seeking "more specialized" education greater protection than a medical student.  *Id.*

But even if, for argument's sake, the Court treats Dr. Mares as an employee, the question remains whether she was an employee who could be fired only for cause.  That question matters because at-will employees do not have a protected interest in continued employment for purposes of procedural due process.  *Schwamberger v. Marion Cty. Bd. of Elections*, 988 F.3d 851, 858 (6th Cir. 2021).

And here, Dr. Mares's employment relationship with Miami Valley Hospital was "at will."  Resident-Fellow Agreement, R.54-1, PageID#1826.  Thus, treating Dr. Mares as an indirect employee of Wright State, her procedural-due-process claim fares even worse.

Regardless, for the reasons outlined above, the precise characterization of Dr. Mares's situation does not actually dictate the outcome here.  Dr. Mares received plenty of process under any conceivably applicable framework.

**b.**  Dr. Mares next argues that Wright State's process for dismissing her was not careful and deliberate.  On this front, she primarily argues that the hearing panel recommended a more favorable outcome than that which she ultimately received.  Mares Br.14.  It is hard to understand why Dr. Mares thinks the panel's recommended *outcome* is material to a legal analysis about *procedure*.  Again, what due process guarantees is process; it does not guarantee any particular result, and it certainly does not guarantee whatever is the most favorable result that any participant in the entire disciplinary process recommended.  *See Walters*, 473 U.S. at 321.  If anything, the panel's recommendation cuts against Dr. Mares's procedural claim:  it shows that Dr. Mares received an opportunity to be heard during Wright State's review process, and that she even managed to convince some participants to side with her.

Regardless, Dr. Mares misunderstands the nature of the panel's recommendation. It is true that, under Wright State's review process, part of the hearing panel's task was to decide whether "substantial evidence" supported the residency program's intended action. Resident Manual, R.54-23, PageID#2078. But that evidentiary standard applies to fact disputes. Contrary to Dr. Mares's repeated suggestions, the panel's review here did not focus on factfinding. *Contra* Mares Br.14, 17, 19. During the panel hearing, Dr. Mares admitted that the events leading to her dismissal "happened." Hearing Tr., R.54-26, PageID#2324. And she largely conceded that her behavior was unprofessional. *Id.* at PageID#2324, 2339; *cf. also* Mares Depo., R.52, PageID#969, 1031. As a result, the panel simply recommended what punishment it thought Dr. Mares should receive given her conceded misbehavior. *See* Ex. 16, R.54-16, PageID#1875–76.

And Wright State was *not* required to defer to the panel's advice. Under the plain terms of Wright State's review process, the panel's decision was merely a "recommendation"; it never constituted Wright State's decision. *See* Resident Manual, R.54-23, PageID#2079. Indeed, Dr. Painter explained at the start of Dr. Mares's hearing that the governing policy tasked the panel with "mak[ing] a recommendation" to Drs. Dunn and Zryd. Hearing Tr., R.54-26, PageID#2226. That one panel member apparently believed that the panel's advice would be "outcome

48

determinative," Croom Depo., R.65, PageID#2627, does not change the panel's recommendation into a mandate.

Ultimately, nothing about the panel's recommendation reveals that other doctors—who chose a different course—were careless in their decisionmaking. *Contra* Mares Br.14–19. Because of Dr. Mares's (largely conceded) history of misconduct, all fifteen doctors that reviewed Dr. Mares's situation during the various stages of review agreed on the need for some form of continued punishment. The only area of disagreement concerned the precise amount of punishment needed. That is the type of "more subjective and evaluative" question, *see Horowitz*, 435 U.S. at 90, upon which "[r]easonable minds can come to very different conclusions" after careful thought, *United States v. Hairston*, 502 F.3d 378, 386 (6th Cir. 2007) (quotation omitted). Thus, the fact that a large group of doctors came to different conclusions about the exact punishment Dr. Mares should receive in no way reveals that Dr. Mares received illusory process. *Contra* Mares Br.11. Dr. Edwards, moreover, detailed why she believed the panel's recommendation was "unsound" as a matter of academic practice. Edwards Depo., R.51, PageID#801–02, 804–05; *see also* Yaklic Depo., R.55, PageID#2426. She explained, for example, that a responsible university should not graduate a student who still needs to be on

probation up to the very moment of graduation. Edwards Depo., R.51, Page-ID#801–02.

Finally, Dr. Mares mistakenly compares the decision in this case to the Fourth Circuit's preliminary decision in *Jones v. Bd. of Governors of Univ. of North Carolina*, 704 F.2d 713 (4th Cir. 1983). That case involved a nursing student (Jones) accused of cheating on a test. A student review board found Jones guilty of cheating. *Id.* at 715. On initial appeal, a faculty board concluded that Jones was not guilty of cheating. *Id.* But, on final review, the university's vice-chancellor reinstated the student-board's determination. *Id.* Dr. Mares's reliance on *Jones* is misplaced, both legally and factually. Legally, the Fourth Circuit in *Jones* merely affirmed a preliminary injunction keeping Jones in school pending the conclusion of litigation because "the balance of hardships" weighed "heavily in favor of" Jones. *Id.* at 716. The court "venture[d] no opinion" as to the ultimate merits of Jones's procedural-due-process claim, even recognizing that "Jones's claim" might be "wholly lacking in merit." *Id.* at 717. Factually, everyone agreed in *Jones* that there were serious "irregularities" in the university's student-review process, which "made that proceeding fatally defective." *Id.* at 715. Here, there is no such admission. Nor is there any comparable evidence of procedural defects.

**c.**  Dr. Mares's remaining arguments—which amount to scattershot criticisms of Wright State's review process—also fall flat.  To understand why, it helps to revisit a few basic principles of procedural due process.  Again, procedural due process does not require perfection.  *Cummins*, 662 F. App'x at 451.  As one example, for government notice to be adequate, it must simply give a person a reasonable "sense of the" misconduct of which the person is accused.  *Kuhn v. Washtenaw County*, 709 F.3d 612, 621 (6th Cir. 2013) (quotation omitted); *see also Elder v. McCarthy*, 967 F.3d 113, 128 (2d Cir. 2020).  And even when the government's initial process is deficient in some way, the government may cure deficiencies through additional proceedings.  *Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 804 (7th Cir. 2000).

With these points in mind, consider Dr. Mares's criticisms.  Start with her critique of the clinical competency committee.  She alleges that the committee recommended dismissal based on unreliable information, such as "hearsay."  Mares Br.11.  But "universities are not courts," *Endres*, 938 F.3d at 297, so the committee did not need to apply court-like evidentiary rules.  Anyway, Dr. Mares had multiple chances to address the committee's recommendation.  Dr. Talbot asked for her side of events the day after the recommendation.  Ex. II, R.52-27, PageID#1320.

And Dr. Mares later received a hearing and a written appeal by which to challenge her dismissal.

Dr. Mares also spends much time criticizing the review process of Drs. Dunn and Zryd.  Mares Br.17–18.  Recall that Wright State's dismissal process included an intermediate stage of administrative review.  At that stage, Drs. Dunn and Zryd affirmed Dr. Mares's dismissal.  EX. BBB, R.52-7, PageID#1266.  Both Drs. Dunn and Zryd confirmed at their depositions that they considered the panel's recommendation of lighter discipline.  *See, e.g.*, Dunn Depo., R.50, PageID#740, 753, 756; Zryd Depo., R.61, PageID#2497–98, 2500–01.  Dr. Mares, however, faults these doctors for not being specific enough, and remembering enough, about why they rejected the panel's recommendation.  *See* Mares Br.17–18.  But an imperfect explanation of a decision is a far cry from a constitutional violation.  Contemporaneous with their decision, Drs. Dunn and Zryd identified an entirely legitimate basis for their decision to affirm Dr. Mares's dismissal:  it was "based upon" her "persistent" lack of professionalism.  EX. BBB, R.52-7, PageID1266.

Dr. Mares makes another argument about Drs. Dunn and Zryd, which proves similarly unpersuasive.  She contends that, in their decision affirming her dismissal, these doctors raised "vague allegations" that had not been raised earlier.  Mares Br.17.  In particular, Drs. Dunn and Zryd noted their concern about Dr.

Mares "entering incorrect information in a patient safety report." EX. BBB, R.52-7, PageID1266. This was a reference to an incident that had occurred while Dr. Mares worked at the Wright-Patterson Medical Center in May 2018. *See* Ex. BBBB, R.52-8, PageID#1269–70; *see above* 17.

This passing reference to the patient-safety-report incident gets Dr. Mares nowhere. Remember that Wright State dismissed Dr. Mares because of "multiple instances" of unprofessionalism, not just "one instance." Edwards Depo., R.51, PageID#804. In other words, the patient-safety-report incident was just one item on a long list of events that led faculty to question Dr. Mares's professionalism and communication skills. (Given the frequency of Dr. Mares's unprofessional behavior, giving her perfect notice of every incident that in some way contributed to faculty concerns would have been quite the task.) What matters is that Wright State repeatedly notified Dr. Mares—both before and during dismissal proceedings—of its dissatisfaction with her professionalism and communication skills. *See, e.g.*, Ex. Z, R.52-65, PageID#1676–77; Ex. II, R.52-27, PageID#1320; Ex. TT, R.52-54, PageID#1472–73.

Further, any perceived deficiency in notice did not last long. Dr. Mares was able to address the patient-safety-report incident within her written submission to Dr. Edwards. Ex. 29, R.51-2, PageID#847. And Dr. Mares was well aware of the

incident being referred to, because she already told her side of this incident just a few months earlier. Ex. BBBB, R.52-8, PageID#1269–70.

Finally, even if some other aspect of the administrative-review stage concerns the Court, Dr. Edwards's final review cures any earlier defect in the process. Once again, Dr. Edwards testified to conducting a "lengthy" review process, during which she "read every piece of information that came in." Edwards Depo., R.51, PageID#799. Dr. Mares identifies no evidence calling this testimony into doubt. Indeed, further review of Dr. Edwards's deposition bolsters Dr. Edward's account: she fully explained her reasons for affirming Dr. Mares's dismissal, along with her reasons for rejecting the panel's recommendation. No fair reader of that deposition would call Dr. Edwards's review process "dismissive and insubstantial." Mares Br.18. In criticizing Dr. Edward's review, Dr. Mares simply ignores many of the points Dr. Edwards made, including that Wright State's reputation would be at risk if it allowed a resident who repeatedly behaved unprofessionally to graduate. *See* Edwards Depo., R.51, PageID#805.

To be clear, it does not follow from any of the above discussion that there is a material dispute of fact justifying a trial. At the risk of undue repetition, Dr. Mares's claim is about the *process*, not results. As a normative matter, reasonable minds can perhaps disagree about whether Wright State chose the best course

when it dismissed Dr. Mares from its residency program.  But that potential disagreement (as to the dismissal decision) is immaterial to the legal analysis (which is about the process due).  In this case, there is no genuine factual dispute about the process that Dr. Mares received.  For example, all agree that Dr. Mares received a hearing and that she filed a written appeal to Dr. Edwards.  What Dr. Mares disputes is the *legal* significance of these undisputed facts.  And she gets the law wrong.

### B.    Dr. Mares's substantive-due-process claim fails.

Dr. Mares also claims that her dismissal violated her right to substantive due process.  This claim fares no better.

**1.**  Again, the Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV.  The Supreme Court has held that, in addition to affording procedural rights, this language has "a substantive component," which applies when government conduct infringes on a fundamental right.  *Reno*, 507 U.S. at 302.  But "the list of fundamental rights is short" and "seldom expanded."  *In re City of Detroit*, 841 F.3d 684, 700 (6th Cir. 2016) (quotation omitted).  The term refers only to those rights that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Id.* at 699 (quotation omitted).

The Supreme Court has further said that government conduct violates substantive due process if it "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998).  But conscience-shocking behavior is also rare, at least in this constitutional sense.  To shock the conscience, government conduct must be so "egregious," "brutal," and "offensive," that it "violates the decencies of civilized conduct." *Range*, 763 F.3d at 589–90 (quotation omitted).  And, to shock the conscience, a government actor must act "with a culpable state of mind." *Chambers v. Sanders*, 63 F.4th 1092, 1097–98 (6th Cir. 2023).  Negligent conduct—even to the point of obtaining someone's wrongful conviction for a crime—is not enough. *See id.* at 1095, 1097.

**2.**  Applying the above standards, any claim that the Wright State defendants violated Dr. Mares's right to substantive due process borders on frivolous.  While students might have a protected property interest in completing their post-secondary education (for purposes of procedural due process), *see above* 39, they do not also possess a fundamental right to complete post-secondary education (for purposes of substantive due process), *see Doe*, 882 F.3d at 598; *Bell*, 351 F.3d at 250–51.  And Dr. Mares does not seriously argue that her dismissal from her residency program was conscience-shocking behavior. *See* Mares Br.20.  That makes sense because Dr. Mares's admitted to several instances of unprofessional behav-

ior. *See, e.g.*, Hearing Tr., R.54-26, PageID#2324, 2339; Mares Depo., R.52, PageID#969, 1031. And professionalism is a legitimate academic consideration in determining who is qualified to become a doctor. *Endres*, 938 F.3d at 299; *Al-Dabagh*, 777 F.3d at 359–60. Further, Dr. Mares identifies no evidence reasonably suggesting that any of the doctors who reviewed her situation acted with any culpable state of mind. Adding all of this up, any notion that Dr. Mares's dismissal "shocks the conscience" is—to be blunt—absurd.

**3.** Perhaps recognizing all this, Dr. Mares strains for another option. She says that her dismissal violates substantive due process because Wright State's dismissal decision was "arbitrary and capricious." Mares Br.19–23. This last-ditch argument also fails.

"The interests protected by substantive due process are of course much narrower than those protected by procedural due process." *Bell*, 351 F.3d at 249–50. It follows that courts should not treat substantive due process as "a font of tort law." *See Range*, 763 F.3d at 590. To be sure, this Court sometimes describes substantive due process as capturing "arbitrary and capricious" government action. *Pearson*, 961 F.2d at 1221 (quotation omitted). That language "causes considerable confusion," because it sounds like a run-of-the-mill legal standard. *Id.* But for constitutional purposes, the phrase "arbitrary and capricious" has a "*strict*" meaning.

*Id.* (quotation omitted).  It connotes action lacking *any conceivable* rational basis. *Id.*  And, critically here, this Court has held that claims of "arbitrary or capricious" action are insufficient to support a claim challenging a medical student's dismissal from a university.  *Bell*, 351 F.3d at 251.

In this case, the Court's decision in *Bell* forecloses Dr. Mares's claim of arbitrary-and-capricious conduct.  Even assuming otherwise, the conduct and decision at issue in this case comes nowhere close to the arbitrary-and-capricious standard.  Dr. Mares's repeated unprofessional behavior gave Wright State entirely legitimate and rational reasons for dismissing her from its residency program.  Given Dr. Mares's pattern of unprofessional conduct—much of which she admitted—Wright State would have been putting its reputation on the line if it allowed Dr. Mares to graduate and become a full-fledged doctor.  At day's end, Dr. Mares's argument boils down to a difference of opinion as to whether Wright State should have been given her one last chance to graduate.  But no matter what label Dr. Mares employs to describe that disagreement, the Due Process Clause does not give Dr. Mares a right to her preferred outcome, much less render any other outcome "capricious."

## II.   Qualified immunity bars Dr. Mares's claims for money damages against Drs. Painter, Talbot, and Yaklic.

For the sake of completeness, there is one more topic to address.  As mentioned earlier, Dr. Mares asserts claims against Drs. Painter, Talbot, and Yaklic in

their individual capacity, seeking money damages.  Am. Compl., R.39, PageID#578, 583–84.  All of Dr. Mares's claims against these defendants fail for the reasons already discussed.  But even if the Court concludes that some aspect of Dr. Mares's case survives, it should still affirm summary judgment as to the damages claims against these individual doctors.

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *City of Tahlequah*, 142 S. Ct. at 12 (quotation omitted).  The doctrine "protects all but the plainly incompetent or those who knowingly violate the law."  *Id.* (quotation omitted).  To overcome qualified immunity, a plaintiff must identify a "legal principle" that "clearly prohibit[ed]" the officials conduct under "the particular circumstances."  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  That "requires a high degree of specificity," as opposed to a "high level of generality."  *Id.* (quotation omitted).  A plaintiff must show that the unlawfulness of the challenged conduct was "beyond debate."  *Id.* at 64 (quotation omitted).

Even if the Court disagrees with some aspect of the merits analysis above, the individual doctors are entitled to qualified immunity.  They did not violate any clearly established principles of due process.  The Supreme Court has recognized

that the Constitution leaves educators considerable room to decide who receives a degree, particularly "as one advances through the varying regimes of the educational system, and the instruction becomes both more individualized and more specialized." *Horowitz*, 435 U.S. at 90. Indeed, it is not even clearly established that students possess *any* constitutionally protected interest in obtaining graduate degrees. *Id.* at 84; *Ewing*, 474 U.S. at 222–23.

Dr. Mares's claims against Drs. Painter and Yaklic fail for yet another reason. "Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). This means that individuals cannot be liable under §1983 for an adverse decision unless they were the decisionmaker. *See Poppy v. City of Willoughby Hills*, 96 F. App'x 292, 294–95 (6th Cir. 2004).

Dr. Mares's §1983 claims against Drs. Painter and Yaklic sound in vicarious liability, and thus fail. Dr. Painter—who was Wright State's designated institutional official at the time, *see above* 6—played a neutral role during Dr. Mares's panel hearing. Painter Depo., R.53, PageID#1695. Dr. Yaklic was also not a decisionmaker. He was at best a secondary advisor, providing input to Dr. Talbot only after the clinical competency committee's recommendation to dismiss. Yaklic Depo., R.55, PageID#2414–15, 2423.

60

# CONCLUSION

For these reasons, the Court should affirm the District Court's judgment.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS*
Solicitor General
  **Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@ohioago.gov

*Counsel for Appellees*
  *Wright State University, Albert F. Painter, The-*
*odore Talbot, and Jerome L. Yaklic*

61

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, this brief complies with the type-volume requirements for a principal brief and contains 12,753 words. *See* Fed. R. App. P. 32(a)(7)(B)(i).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2023, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS

## DESIGNATION OF DISTRICT COURT RECORD

Defendants-Appellees, pursuant to Sixth Circuit Rule 30(g), designate the

following filings from the district court's electronic records:

*Mares v. Miami Valley Hospital, et al.*, Case No. 3:20-cv-00453

| Date Filed | R. No.; PageID# | Document Description |
|---|---|---|
| 11/5/2020 | R.1; 2 | Complaint |
| 4/8/2021 | R.13; 90–91 | Plaintiff's Response to Defendants' Rule 12(c) Motions |
| 12/17/2021 | R.29; 219 | Plaintiff's Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings |
| 3/15/2022 | R.39; 576–84 | Amended Complaint |
| 9/12/2022 | R.50; 740, 753, 756 | Deposition of Margaret Dunn |
| 9/12/2022 | R.51; 796–811, 829–62 | Deposition of Susan Edwards |
| 9/12/2022 | R.52; 875–90, 901, 926–36, 956–58, 966–74, 1010–12, 1031, 1039–42, 1052–57, 1071, 1156–57, 1231, 1266–74, 1289, 1306–1340, 1346–57, 1363, 1471–95, 1676–77 | Deposition of Jacquelyn Mares and attached exhibits |
| 9/12/2022 | R.53; 1690–95, 1709–10, 1717 | Deposition of Albert Painter |
| 9/12/2022 | R.54; 1749, 1759–64, 1826–30, 1875–78, 2035–203, 2224–403 | Deposition of Theodore Talbot and attached exhibits |
| 9/12/2022 | R.55; 2414–26, 2434 | Deposition of Jerome Yaklic |
| 10/12/2022 | R.61; 2497–98, 2500–01 | Deposition of Teresa Zryd |

| Date Filed | R. No.; PageID# | Document Description |
|------------|-----------------|----------------------|
| 10/14/2022 | R.65; 2627 | Deposition of Christopher Croom |
| 5/2/2023 | R.69; 2825–39 | Order granting Defendants' Motion for Summary Judgment |
| 5/2/2023 | R.70; 2840 | Judgment Entry |
| 5/30/2023 | R.71; 2841–42 | Notice of Appeal |