Case No. 23-3475

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

JACQUELYN MARES, M.D.,

                Plaintiff-Appellant,

v.

MIAMI VALLEY HOSPITAL, *et al.*,

                Defendants-Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Case No. 3:20-cv-00453-MJN

_____

**REPLY BRIEF OF APPELLANT JACQUELYN MARES, M.D.**

Respectfully submitted,

| | |
|---|---|
| MEZIBOV BUTLER | MAREK WEISMAN LLC |
| /s/ Marc Mezibov | /s/ Rachel Rutter |
| Marc Mezibov (OH No. 0019316) | Rachel Rutter |
| 615 Elsinor Place, Suite 105 | 332 S. Michigan Ave., Suite 900 |
| Cincinnati, OH 45202 | Chicago, IL 60604 |
| Phone 513-621-8800 | Phone 312-470-7662 |
| mmezibov@mezibov.com | rrutter@marekweisman.com |

Attorneys for Plaintiff-Appellant Jacquelyn Mares, M.D.

# TABLE OF AUTHORITIES

*Al-Dabagh v. Case W. Res. Univ.*, 777 F.3d 355 (6th Cir. 2015)…………………………..13

*Allstate Ins. Co. v. Papanek*, No. 3:15-cv-240, 2018 WL 3537140 (S.D. Ohio July 23, 2018)………………………………………………………………………………………….12

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 106 S. Ct. 2505 L. Ed. 2d 202 (1986) …3, 11

*Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433 (1996)……………………..12

*Hodak v. Madison Capital Mgmt., LLC*, 348 Fed. Appx. 83 (6th Cir. 2009)……………….4

*In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265 (6th Cir. 2019)………...4

*JCV 671 v. MMA Mgmt., LLC*, 579 F. Supp. 2d 909 (N.D. Ohio 2008)…………….12

*Jones v. Board of Governors of University of North Carolina*, 557 F. Supp. 263 (W.D.N.C. 1983)…………………………………………………………………………………………14

*Littlejohn v. Parrish*, 163 Ohio App.3d 456 (2005)…………………………………………12

*Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453 (2018)………………..11, 12

*Third Fed. S. & L. Ass'n of Cleveland v. Formanik*, 64 N.E.3d 1034 (Ohio Ct. App. 2016)………………………………………………………………………………………….12

**REPLY ARGUMENT**

Dr. Mares won her due process appeal before a panel of three faculty members following a full evidentiary hearing. MVH and WSU simply ignored the result and dismissed her from their residency program anyway. Dr. Mares' opening brief ("Mares Br.") explains why this was a breach of her Resident-Fellow Agreement by MVH and a violation of constitutional due process by WSU, and further explains why summary judgment on those claims was erroneous. MVH and WSU submitted nearly 100 pages of argument in response ("MVH Br." and "WSU Br."), but they cannot defend the indefensible and the law and common sense align against them.

**Breach of Contract Claims Against MVH**

Dr. Mares asserted a breach of contract claim against MVH because it had an independent obligation to terminate her (a) only for certain reasons and (b) only in compliance with due process protections (<u>contractual</u> due process, which is decided between the parties and independent of any constitutional standard). MVH complied with neither obligation, and there are many disputed issues of material fact embedded within the proper analysis of those claims. None of the constitutional due process arguments of MVH or WSU are relevant to this proper analysis of the contract claims.

These disputed issues of material fact precluded summary judgment for MVH. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment.") Dr. Mares need not present evidence conclusively establishing her positions, but only sufficient evidence to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249.

As noted by Dr. Mares in her opening brief, "the determination of whether a material breach has occurred is generally a question of fact." Mares Br. 23, *quoting Hodak v. Madison Capital Mgmt., LLC*, 348 Fed. Appx. 83, 90 (6th Cir. 2009). But beyond that, MVH's response brief also illustrates there are disputed issues of material fact regarding the scope of MVH's obligations under ambiguous contract provisions. "If ambiguity exists…the meaning of a contract is a question of fact." *In re Fifth Third Early Access Cash Advance Litig.,* 925 F.3d 265, 276 (6th Cir. 2019) (quotations omitted).

MVH argues that under "unambiguous" contract language, Dr. Mares was an "at will" employee who could be terminated at any time for any reason in its sole discretion. (MVH Br. 11.) But that is not how the contract reads. It refers to an "at will" status generally, but qualifies this with an entire paragraph of more specific language permitting termination only in certain circumstances. (MVH-Mares contract, RE 39-1 PAGEID #589). At best, the contract is ambiguous as to whether it permits termination for symptoms of "occupational burnout" caused by MVH itself (see below), or to protect MVH's accreditation statistics (see below).

Additionally, termination was permitted "if in the Program's opinion the resident/fellow substantially fails to meet any of the general requirements of the

4

Program." (*Id.*) A jury should be allowed to determine who speaks for "the Program" in this situation—is it the Program Director who "intends" to terminate the resident, or is it the faculty panel that subsequently "determine[s] if there is substantial evidence to support the program's intended action"? (Item 504, RE 39-3 PAGEID #596 (incorporated by reference in the contract, RE 39-1 PAGEID #589)). If the latter, then MVH clearly breached the contract by terminating Dr. Mares.

Moreover, termination is permitted "by the Hospital" (defined as MVH) if a resident is terminated "by the Program." (MVH-Mares contract, RE 39-1 PAGEID #589.) MVH interprets the latter to mean WSU alone, but the document as a whole considers "Program" to mean both MVH and WSU jointly. (*See, e.g., id.*, PAGEID # 587 ("Miami Valley Hospital agrees to employ [Dr. Mares] in the…Program" and "Hospital agrees through its affiliation with [WSU] to…provide a training program.")) When referring to WSU alone, the contract refers to the "University." (*Id.*, PAGEID #588 ("this contract specifically incorporates all Hospital, University, and Program policies")). Thus, MVH's interpretation would make the contract language improperly circular: it would be permitted to terminate Dr. Mares if it terminated Dr. Mares. The District Court erroneously resolved this issue of fact in MVH's favor. (RE 69 PAGEID #2838).

The District Court also disregarded the ambiguous portion of that same provision. It held the contract allowed MVH to terminate Dr. Mares if she "was 'terminated by the [p]rogram.'" (*Id.*) But that quotation stops in mid-sentence and

5

short of an explicit caveat: MVH was permitted to terminate its contract with Dr. Mares if she was "terminated by the Program consistent with the [WSU] Item 504 – Academic and Professional Standards/Due Process." (MVH-Mares contract, RE 39-1 PAGEID #589.)  Dr. Mares respectfully suggests this provision is not ambiguous at all, and that it does not permit her termination where the Item 504 faculty panel reached the finding of fact there was insufficient evidence to support termination. But giving the benefit of the doubt to MVH, its obligations under this provision are at very least a disputed issue of fact for the jury.

Turning to disputed issues of material fact regarding whether breaches occurred, Dr. Mares argued in her opening brief there was no proper or sufficient basis for her termination. Mares Br. 6-9. Both WSU and MVH hotly contest this, and attempt to establish with sheer repetition and voluminous record citations that Dr. Mares was terminated for "unprofessionalism." (*See, e.g.,* WSU Br. 2, 15, 19, 28, 31, 32, 42, 43, 48, 53, 56, 58. *See also,* MVH Br. 4 n.1 (incorporating same by reference)).

Either way, this is a disputed issue of material fact precluding summary judgment. For example, Dr. Mares has argued from the outset that she was terminated for the improper purpose of manipulating a certain statistic important to the residency program's accreditation. (Amd. Compl. RE 39 PAGEID #576.[1]) As she argued to the

---

[1] "This action arises from the decision of Defendants to dismiss Dr. Mares from the Wright State University Obstetrics and Gynecology Program…after she expressed an unwillingness to take a board certification exam in the subject area of her residency. Because the percentage of graduate students who take the examination is critical to

District Court, the record below contains compelling evidence that this was the true reason for her termination, not purported unprofessionalism. (*See, e.g.,* SJ Resp. Br., RE 66 PAGEID #2785.)

Dr. Mares began training in the Program in June 2016. (Mares Dep RE 52 PAGEID #893; MVH Employment Contract RE 54-1). She was required to "work over 80 hours a week with a 24-hour call every single week." (Mares Dep. RE 52 PAGEID #962). This took its toll, and over the course of her early years Dr. Mares occasionally displayed the fatigue and burnout symptoms of moodiness, irritability, and abrasiveness, which her superiors lumped together as "unprofessionalism." (*See, e.g.,* RE 54-7 PAGEID #1859, "your effort and overall patient care are acceptable; however…[you] can be perceived as rude and showing a lack of respect.")

Setting aside that professionalism is considered a subject of instruction in residency, not a pre-existing personality trait, Dr. Mares eventually gained control of her burnout symptoms as reflected in her formal bi-annual performance review on August 29, 2018, which noted her professionalism and communication had "dramatically improved" and that she "definitely has made strides in improving the aspects of professionalism. (RE 54-10 PAGEID #1865).

---

maintaining the program's accreditation, Defendants dismissed Dr. Mares even though she had completed three years of her residency, was in good academic standing, was scheduled to graduate at the end of the current erm, and even after a properly constituted panel of faculty recommended that she not be dismissed."

Even as she dealt with some symptoms, however, other symptoms of fatigue and burnout began to materialize. More specifically, Dr. Mares lost motivation and became less and less interested in taking the OBGYN board-certification exam ("Boards"). This created an accreditation risk for the Program, which was at that time[2] required by the Accreditation Council for Graduate Medical Education ("ACGME") to maintain a "take rate" of eighty percent (80%), *i.e.,* the Program's accreditation could be negatively impacted if less than 80% of its graduates took the Boards. (Talbot Dep. RE 54 Page ID # 1772, 1783, "if you do not have that, you get a citation.")

The Program had only five residents in Dr. Mares' class. (*Id.* RE 54 Page ID # 1784). But one of those residents was pregnant, and the Program was worried (being OBGYNs) that in the event of maternity leave or a pregnancy complication she might not graduate, or worse yet might graduate but not take the Boards. Thus, the Program was already at risk of an 80% take rate, and would fall to 60% or 75% if Dr. Mares did not take the Boards. In any event "we want to have a hundred percent take…it's not mandatory…it's just a goal." (Talbot Dep. RE 54 Page ID # 1787).

Dr. Mares first disclosed her hesitations to the Program in January 2018 during a bi-annual evaluation meeting. (RE 54-5 Page ID # 1856, "she admitted today she is not sure…whether or not she is taking her oral boards or unsure if she will approach

---

[2] ACGME later dropped this requirement, focusing on only the "pass rate" and not the "take rate," (OBPRs, RE 54-20 PAGEID # 1919 V.C.3.))

board certification process.") In an April 20, 2018 "probation meeting," Dr. Talbot started incongruously tying her post-graduation plans to her March 2018 probation and remediation requirements. (RE 54-9 Page ID # 1864, "I reiterated that it is our strong desire to see that she…takes her written, and ultimately, oral board examinations.") During this same period, Dr. Yaklic joined in on pressuring Dr. Mares: "I personally asked you, mentioned in the hall a couple times informally, and said you really need to graduate. <u>You really need to sit for your Boards</u>." (Panel Tr. RE 52-64, Page ID # 1641 (emphasis added)).

Dr. Talbot followed up on this again in her August 29, 2018 bi-annual evaluation, and referred specifically to his concern about the Program's take rate (RE 54-10 Page ID # 1866) (emphasis added):

> <u>I discussed that her options would be much broader should she go ahead and complete the ABOG board certification process, however, she did not want to commit to taking the board exams. When I questioned her if she has registered for the boards, she shrugged her shoulders in a manner indicating to me it is likely she has not</u>. She is aware that our department, as a whole, strongly encourages all of our residents to take the ABOG written and oral exams and become board-certified. <u>There are ACGME requirements for Accreditation that specify numbers that must take and pass the exam from our program</u>.

Upon learning this, the Program's criticisms of Dr. Mares immediately intensified and continued throughout the month of September 2018, culminating in the October 3, 2018 CCC meeting and vote to recommend her dismissal. (RE 54-12). In that meeting, "much debate centered on the fact that she has verbalized on several

occasions she does not intend to practice OBGYN after graduation, and will not commit to taking the OBOG qualifying exam at graduation," which the committee claimed "presents a patient safety issue." (*Id.*).

The following day, Dr. Talbot offered Dr. Mares a last-minute opportunity to avoid termination <u>by promising to take the Boards</u> (RE 52-19 Page ID #1323) (emphasis added):

> <u>It was very clearly explained to her that there were 2 questions in particular that Dr. Talbot was look for answers to:… 2. Do you intend to take your boards, and/or practice as an OB/GYN in the event that you graduate from this program?</u> Both of these questions were answered with crossed arms and a very indignant "I have nothing to say" by Dr. Mares….Dr. Talbot again told her that this was her opportunity to sit down and talk to him. <u>(Dr. Talbot) "Can you give me a yes or no to the questions? Do you intend to take your boards?"</u>

Dr. Mares did not commit to taking the Boards in that October 4, 2018 meeting, and she was terminated the following day. In a Dismissal Notice documenting his termination meeting with Dr. Mares, Dr. Talbot wrote "we discussed based on her…ambivalence toward taking ABOG qualifying exam, that she was not vested or committed to improving herself as a physician." (RE 54-15 Page ID # 1873). The Program later admitted the Boards issue did not truly raise any genuine performance concerns. (Dr. Yaklic Dep. RE 55 Page ID # 2437, "taking the boards or not taking the boards was not a matter of professionalism.")

The MVH contract, however, did not permit the Program to terminate Dr. Mares for her post-graduation plans regarding the Boards. The MVH contract allowed

it to terminate Dr. Mares for certain specific reasons, including if she "substantially fails to meet any of the general requirements of the Program, or is terminated by the Program consistent with the [WSU] Resident Manual, Item 504 – Academic and Professional Standards/Due Process." (RE 54-1 Page ID # 1828 ¶¶VI.F. and F.a.). Dr. Mares later discovered she was the only resident dismissed by WSU and MVH from any program in any specialty for at least five years. (Dr. Zryd Dep. RE 61 Page ID # 2486). The fact issue of why Dr. Mares was terminated is material, indeed critical, to her breach of contract claims against MVH.

In sum, summary judgment for MVH on the breach of contract claims was erroneous because there are many disputed issues of material fact on the scope of its obligations and whether it performed them. A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Here, that standard is met. It is misleading for MVH to argue "there is no genuine factual dispute about the process that Dr. Mares received." (MVH Br. 55). There are many disputes about what MVH was obligated to do, and whether it performed those obligations.

These disputed issues of obligation and performance are even more acute with respect to Dr. Mares' argument that MVH breached the contract's implied duty of good faith and fair dealing. "In addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 463 (2018).

11

"Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed upon purpose and consistency with the justified expectations of the other party." *Id.* "Bad faith may consist of inaction, or maybe the abuse of power to specify terms, [or] interference with or failure to cooperate in the other party's performance." *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 463 (2005). "There is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty." *Lucarell* at 464, citing *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443-444 (1996).

Significantly, "whether parties have acted in good faith and have dealt fairly and reasonably with each other or have breached that obligation and acted in bad faith is a question of fact." *Allstate Ins. Co. v. Papanek*, No. 3:15-cv-240, 2018 WL 3537140, *12 (S.D. Ohio July 23, 2018), *citing Third Fed. S. & L. Ass'n of Cleveland v. Formanik*, 64 N.E.3d 1034, 1049 (Ohio Ct. App. 2016); *See also JCV 671 v. MMA Mgmt., LLC*, 579 F. Supp. 2d 909, 913 (N.D. Ohio 2008) ("whether a party fulfilled the obligation of good faith and fair dealing is a mixed question of fact and law. This is a determination for the jury, not the court").

## Due Process Claims Against WSU

WSU spends more than 20 pages of its 72-page response brief trying to establish an issue of fact: that Dr. Mares was a poor resident who deserved to be fired. (WSU Br. 5-28). Of course, she vigorously disagrees. Defendants Talbot and Yaklic as

prosecutors made this same presentation of exaggerated and cherry-picked information to the faculty panel in Dr. Mares' due process hearing, but they were unconvinced and found—as a matter of fact—there was insufficient evidence to support termination. (*See* panel hearing transcript, RE 54-26). The panel knew residency training was exactly that—training—and that supervisors could cut and paste snippets from thousands of pages of records to retroactively paint the picture as dark as they wanted.

Nonetheless, the District Court adopted these disputed allegations almost verbatim as "Undisputed Facts" (SJ Order, RE 69 PAGEID #2813-2822), and then concluded "there is no genuine dispute that [Dr. Mares] acted unprofessionally." (*Id.*, PAGEID #2831). Among other problems, this ignores the District Court's own statement that "courts are particularly ill-equipped to evaluate academic performance," and that "a reviewing court must show great respect for the faculty's professional judgment and may not override that judgment unless it is such a substantial departure from accepted academic norms as to demonstrate that the…committee responsible did not actually exercise professional judgment." (SJ Order, RE 69 PAGEID # 2831, *quoting Al-Dabagh v. Case W. Res. Univ.*, 777 F.3d 355, 359-61 (6th Cir. 2015)). The District Court did not explain why it was in a better position than the faculty panel to assess Dr. Mares' performance and reach a finding of fact on whether there was sufficient evidence to support her termination.

13

As for the long legal argument in WSU's response brief, it almost completely misses the point. (WSU Br. 29-60). Regardless of how much due process Dr. Mares was entitled to, regardless of whether WSU was obligated to hold the faculty panel hearing at all, and regardless of whether the post-hearing reviews by higher officials were legitimate and standing alone would have sufficed, the fact remains that WSU did hold the hearing and the faculty panel came to a factual finding there was insufficient evidence supporting termination. Once that occurred, it was a violation of Dr. Mares' constitutional Due Process rights to simply ignore that result and terminate her anyway.

WSU spends four pages trying to explain why it is entitled to ignore the faculty panel's finding, but its argument contains no citation to pertinent and supporting legal authority. (WSU Br. 47-50). Indeed, WSU tries to make it an issue of contract interpretation and bases its arguments on its own documents and material. (*Id.*) But this improperly conflates the applicable standards, and WSU is no more entitled to apply contractual standards to Dr. Mares' constitutional claims than MVH is entitled to apply constitutional standards to her contract claims.

Ignoring the results of a due process proceeding is so brazen and obviously improper that few are tempted to do it. Not only is there no supporting law, there is almost no law at all except *Jones v. Board of Governors of University of North Carolina*, 557 F. Supp. 263 (W.D.N.C. 1983), *affirmed* 704 F.2d 713 (4th Cir. 1983). *Jones* is identical to the instant case in all relevant respects, and there both the district court and the

Fourth Circuit ruled that ignoring the due process panel's result was a violation of Due Process. (*See* Mares Br. 15-19). WSU's attempt to distinguish the *Jones* decision is nonsensical. (WSU Br. 50). It makes no difference to the analysis or applicability of those rulings that the plaintiff was a nursing student rather than a medical resident; or that the allegations against her were dishonesty rather than unprofessionalism; or that the rulings occurred in the context of a preliminary injunction. *Jones* is an example of the law aligning with common sense.

## Conclusion

For the foregoing reasons, and those set forth in Dr. Mares' opening brief, the District Court's grant of summary judgment should be reversed as to Counts 1-4.

Respectfully submitted,

MEZIBOV BUTLER
/s/ *Marc D. Mezibov*
Marc D. Mezibov (OH No. 0019316)
615 Elsinore Place, Suite 105
Cincinnati, OH 45202
Phone: 513-621-8800
mmezibov@mezibov.com

and

MAREK WEISMAN, LLC
/s/ *Rachel Rutter*
332 S. Michigan Ave., Suite 900
Chicago, IL 60604
Phone: 312-470-7662
rrutter@marekweisman.com

*Attorneys for Plaintiff-Appellant*
*Jacquelyn Mares, M.D.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify the following:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,335 words, excluding the parts of the brief exempted by the Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word in 14-point Garamond font.

Dated: October 11, 2023                                          */s/ Marc D. Mezibov*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit on October 11, 2023, 2023, by using the appellate CM/ECF system. I certify that service will be accomplished on that date by the appellate CM/ECF system on all counsel of record for Appellees.

*/s/ Marc Mezibov*